IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| RONALD CLINTON LOTT, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| vs. | ) | Case No. CIV-05-891-M |
| | ) | |
| RANDALL G. WORKMAN, Warden, | ) | |
| Oklahoma State Penitentiary, | ) | |
| | ) | |
| Respondent.[1] | ) | |

## **MEMORANDUM OPINION**

Petitioner, Ronald Clinton Lott, a state court prisoner, has filed a Petition for a Writ of Habeas Corpus seeking relief pursuant to 28 U.S.C. § 2254. Doc. 16. Petitioner, who is represented by counsel, is challenging the convictions and sentences entered against him in Oklahoma County District Court Case No. CF-87-963. In that case, Petitioner was found guilty by a jury of two counts of Murder in the First Degree and was sentenced to death on both counts.

In his Petition, Petitioner has presented twenty-two grounds for relief, including a request for an evidentiary hearing. Doc. 16. Respondent has responded to the Petition and

---

[1] When this action was commenced, Mike Mullin was the warden of the Oklahoma State Penitentiary and the properly named Respondent. However, Randall G. Workman is the current warden of the Oklahoma State Penitentiary and the state officer having present custody of Petitioner. Thus, pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, the Court finds that Mr. Workman should be substituted for Mr. Mullin as the proper party Respondent. See Rule 2(a) of the Rules Governing Section 2254 Cases in the United States District Courts ("If the petitioner is currently in custody under a state-court judgment, the petition must name as respondent the state officer who has custody.").

Petitioner has replied. Docs. 25 and 26. The state court record has been provided.[2] After a thorough review of the entire state court record, the pleadings filed herein, and the applicable law, the Court finds that, for the reasons set forth below, Petitioner is not entitled to his requested relief.

## I. Procedural History.

Petitioner's convictions and death sentences are the result of a jury trial held in December 2001. The jury found two aggravating circumstances supporting each death sentence, namely: (1) the murder was especially heinous, atrocious, or cruel; and (2) the murder was committed for the purpose of avoiding or preventing a lawful arrest or prosecution (O.R. VII, 1250-51, 1253-54).

In Case No. D-2002-88, Petitioner appealed his convictions and sentences to the Oklahoma Court of Criminal Appeals (hereinafter "OCCA"). In a published opinion, Lott v. State, 98 P.3d 318 (Okla. Crim. App. 2004), the OCCA denied relief. Rehearing was denied October 13, 2004. Petitioner sought review of the OCCA's decision by the United States Supreme Court. His petition for writ of certiorari was denied on March 28, 2005. Lott v. Oklahoma, 544 U.S. 950 (2005).

_____

[2] Reference herein to the state court record will be as follows: original record (O.R.); preliminary hearing transcripts (P.H. Tr.); other hearing transcripts (Tr.); first trial beginning October 29, 2001 (I Trial Tr.); and second trial beginning December 3, 2001 (II Trial Tr.).

In Case No. PCD-2002-961, Petitioner sought post-conviction relief from the OCCA. In an unpublished opinion, the OCCA denied Petitioner his requested relief. Lott v. State, No. PCD-2002-961 (Okla. Crim. App. Nov. 22, 2004) (unpublished).

## II. Facts.

On or about September 2, 1986, 83-year-old Anna Fowler was raped and murdered in her home. On or about January 11, 1987, 90-year-old[3] Zelma Cutler, who lived across the street from Mrs. Fowler, was raped and murdered in her home. Both ladies lived alone. Lott, 98 P.3d at 327. On February 26, 1987, Robert Miller was charged with the crimes (O.R. I, 1-4). While Mr. Miller was ultimately convicted and sentenced to death for their murders, DNA testing, conducted in 1992 during the pendency of his appeal, showed that he was not the source of the semen found at the scenes (O.R. VIII, 1437; II Trial Tr. VII, 1235-36). Lott, 98 P.3d at 327. Additional DNA testing conducted in 1994 implicated Petitioner, and Petitioner was initially charged with the crimes on March 10, 1995 (O.R. I, 5-8; II Trial Tr. VI, 1132-34). Id. At the time he was charged, Petitioner was incarcerated for the rapes of Grace Marshall and Eleanor Hoster. Mrs. Marshall was raped in her home on March 22, 1987, and Mrs. Hoster was raped in her home on May 7, 1987. Both Mrs. Marshall and Mrs. Hoster were elderly women who lived alone. Id. Additional facts will be referenced herein as they relate to the individual grounds for relief raised by Petitioner.

---

[3] While the OCCA's opinion lists Mrs. Cutler's age as 93, the testimony at trial was that she was 90 years old (II Trial Tr. V, 870).

### III.  Standard of Review.

**A.      Exhaustion as a Preliminary Consideration.**

The exhaustion doctrine is a matter of comity.  It provides that before a federal court can seek to grant habeas relief to a state prisoner, it must first determine that he has exhausted all of his state court remedies.  As acknowledged in <u>Coleman v. Thompson</u>, 501 U.S. 722, 731 (1991), "in a federal system, the States should have the first opportunity to address and correct alleged violations of state prisoner's federal rights." While the exhaustion doctrine has long been a part of habeas jurisprudence, it is now codified in 28 U.S.C. § 2254(b). Pursuant to 28 U.S.C. § 2254(b)(2), "[a]n application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."

**B.      Procedural Bar.**

Beyond the issue of exhaustion, a federal habeas court must also examine the state court's resolution of the presented claim.  "It is well established that federal courts will not review questions of federal law presented in a habeas petition when the state court's decision rests upon a state-law ground that 'is independent of the federal question and adequate to support the judgment.'" <u>Cone v. Bell</u>, ___ U.S. ___, 129 S.Ct. 1769, 1780 (2009) (quoting <u>Coleman</u>).  "The doctrine applies to bar federal habeas when a state court declined to address a prisoner's federal claims because the prisoner had failed to meet a state procedural requirement." <u>Coleman</u>, 501 U.S. at 729-30.

### C.    Merits.

In accordance with 28 U.S.C. § 2254(d), the Court's ability to grant habeas corpus relief to state prisoners is limited.  When a state prisoner presents a claim to this Court, the merits of which have been addressed in state court proceedings, the Court cannot grant habeas corpus relief upon the claim unless it determines that the state court proceedings resulted in a decision (1) "that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or (2) "that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

The focus of Section 2254(d) is on the reasonableness of the state court's decision. To obtain relief, a petitioner must show that the state court decision is "objectively unreasonable." Williams v. Taylor, 529 U.S. 362, 409 (2000) (O'Connor, J., concurring but delivering the opinion of the Court with respect to Part II). "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable - a substantially higher threshold." Schiro v. Landrigan, 550 U.S. 465, 473 (2007).

"Under § 2254(d), a habeas court must determine what arguments or theories supported . . . the state court's decision; and then it must ask whether it is possible fairminded

jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." Harrison v. Richter, ___ U.S. ___, 131 S.Ct. 770, 786 (2011). Relief is warranted only "where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme Court's] precedents." Id. The deference embodied in Section 2254(d) "reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." Id. (citation omitted).

## IV. Analysis.

### A.    Ground One:        Speedy Trial.

In his Ground One, Petitioner asserts that his right to a speedy trial was denied. Petitioner raised this claim on direct appeal. In a thorough analysis, the OCCA applied Barker v. Wingo, 407 U.S. 514 (1972), and concluded that Petitioner was not entitled to relief. Lott, 98 P.3d at 327-33. Because the OCCA addressed Petitioner's speedy trial claim on the merits, Petitioner may obtain relief from this Court only upon satisfaction of Section 2254(d). With reference to Section 2254(d), Petitioner argues that the OCCA's denial of his claim is both an unreasonable application of Supreme Court law and an unreasonable determination of the facts. Respondent acknowledges that the claim is exhausted and contends that the OCCA's decision is reasonable. Respondent further contends that the Court should afford a presumption of correctness to facts determined by the trial court in its resolution of the claim.

1.      **Applicable Law.**

"The right to a speedy trial is generically different from any of the other rights enshrined in the Constitution for the protection of the accused."  Barker, 407 U.S. at 519. First, in addition to the general concern that criminal procedures be fairly applied, society as a whole has an interest in the swift administration of justice. Second, unlike other constitutional rights, a speedy trial infringement might actually benefit the defendant. Because fading memories and witness unavailability can hamper the prosecution in proving its case beyond a reasonable doubt, a delay does not automatically result in prejudice to the defendant. Third, the speedy trial right is a vague concept which cannot be precisely determined. Id. at 519-21. "[H]ow long is too long in a system where justice is supposed to be swift but deliberate[?]" Id. at 521.

With these considerations in mind, the Supreme Court developed a balancing test to assess speedy trial claims.  The test, as pronounced in Barker, weighs "the conduct of both the prosecution and the defendant." Id. at 530.  Applied on an case-by-case basis, the factors may vary, but include consideration of the following: length of the delay, reasons for the delay, the defendant's assertion of the right, and prejudice.  Id.  The Supreme Court's guidance as to application of the factors is as follows:

> We regard none of the four factors identified . . . as either a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial. Rather, they are related factors and must be considered together with such other circumstances as may be relevant. In sum, these factors have no talismanic qualities; courts must still engage in a difficult and sensitive balancing process. But, because we are dealing with a fundamental right of the

accused, this process must be carried out with full recognition that the accused's interest in a speedy trial is specifically affirmed in the Constitution.

Id. at 533 (footnote omitted).

Due to the balancing test employed, habeas review of a speedy trial claim necessarily entails consideration of the individual factors as well as their balancing. Jackson v. Ray, 390 F.3d 1254, 1260 (10th Cir. 2004). For each factor, the Court must determine whether the OCCA's finding is (1) contrary to or an unreasonable application of Supreme Court law and/or (2) an unreasonable determination of the facts. However, even if the Court finds that the OCCA acted unreasonably with respect to a particular factor, relief cannot be granted on this finding alone. The OCCA's balancing of the factors must also be reviewed, and "[h]abeas relief is *only* available if there is *no possible* balancing of the factors that both supports the OCCA's decision and is not contrary to clearly established Supreme Court precedent." Id. (emphasis added). See also Simms v. Bravo, 111 Fed.Appx. 552, 554 (10th Cir. 2004) (unpublished) ("AEDPA only allows us to grant the petition if the state court's decision falls outside the range of reasonable applications of the Barker test, and the Supreme Court made it clear in Barker that the range is very broad indeed.").

### 2. The Facts.

Neither Petitioner's Petition nor the OCCA's decision give a complete and accurate statement of the progression of Petitioner's case. After a painstaking review of the record, hampered by the absence of documents, the lack of court reporters for many of the court

9

proceedings, and vague court minutes, the Court has compiled the most accurate and comprehensive chronology of the case. The facts of the case are as follows.

On March 10, 1995, while incarcerated for the Marshall/Hoster rapes, Petitioner was first charged with the Fowler/Cutler murders (O.R. I, 5-8). Due to problems in finding counsel without conflicts, Joe Robertson of the Oklahoma Indigent Defense System did not enter an appearance until September 8th (O.R. I, 21-22; P.H. Tr. 11/3/1997, 6-7). Preliminary hearing was set for November. On November 16th, however, the State filed a motion for continuance because a witness was unable to attend the preliminary hearing as scheduled. The State's motion was granted and preliminary hearing was continued until January 31, 1996 (O.R. I, 27-28). However, on January 30th, the day before preliminary hearing was set to begin, the State dismissed the case "PENDING FURTHER INVESTIGATIONS" (O.R. I, 35).

Almost fourteen months later, on March 19, 1997, the State re-filed against Petitioner (O.R. I, 40-43). On July 15th, the Third Information was re-filed and a warrant was issued for Petitioner's arrest (O.R. I, 47-58). Petitioner was arraigned July 22nd (O.R. I, 59). On August 27th, Mr. Robertson again entered his appearance (O.R. I, 62). It appears that preliminary hearing was set for November 3rd. On that day, Petitioner made a demand for the appearance of all DNA chain of custody witnesses and a hearing was held. At the request of the State, preliminary hearing was continued until December 18th (O.R. I, 94-95; P.H. Tr. 11/3/1997, 19-20). Preliminary hearing was held December 18th and 19th;

January 30, 1998; February 13th[4]; and March 20th. Preliminary hearing was held over this four-month period due to the large number of witnesses that had to be called and schedule coordination (P.H. Tr. 12/18/1997, 4; P.H. Tr. 1/30/1998, 203). Petitioner was bound over for trial on March 20th. The assigned trial judge was Judge Charles Owens (O.R. II, 251; P.H. Tr. 3/20/1998, 104).

Pretrial was set for May 1, 1998; however, the docket reflects that on that date, the pretrial trial conference and all motions were continued until August 26th. No reason for the continuance is noted (O.R. II, 251; O.R. VIII, 1597). Petitioner's then counsel, Mr. Robertson, testified at the hearing held on Petitioner's speedy trial motion that he never agreed to any continuance before Judge Owens and did not know why the continuance was granted (Tr. 5/26/2000, 18, 57). In his order denying Petitioner's speedy trial motion, Judge Virgil Black found that the hearing was continued by agreement of the parties to allow for the completion of preliminary hearing transcripts. Lott, 98 P.3d at 360.[5] The record reflects that on July 15, 1998, Petitioner made application for and obtained an order for preliminary hearing transcripts at State expense (O.R. II, 399-400; O.R. III, 401-02). The transcripts were filed as completed, with the last one being filed September 21st. Id.

---

[4] On this date, Petitioner discharged his sentences for the Marshall/Hoster rapes and was held in custody from this point forward solely on the Fowler/Cutler murder charges (O.R. VIII, 1468).

[5] A copy of Judge Black's Findings of Fact and Conclusion of Law is appended to the OCCA's decision. Lott, 98 P.3d at 359-62.

The docket is silent as to what occurred on August 26th[6], but it is clear that the matter was continued once again until October 27th. At the speedy trial hearing, the State argued that this hearing was continued at Petitioner's request to allow for the completion of the preliminary hearing transcripts (Tr. 5/26/2000, 60-61, 131-32).[7] In his order denying Petitioner's speedy trial motion, Judge Black noted this reason as well, but did not note who requested the continuance. Lott, 98 P.3d at 360.

The docket reflects that on October 27th, the pretrial trial conference and motions were continued until November 30th. On November 30th, another continuance was granted until February 1, 1999. No reason for the continuances is noted (O.R. VIII, 1476, 1594). In his order denying Petitioner's speedy trial motion, Judge Black found that these continuances were due to Judge Owens' retirement: "Judge Owens chose not to hear the pre-trial motions since he would not be the presiding Judge of the trial." Lott, 98 P.3d at 360.

Judge Owens retired in January 1999 and all of his cases were transferred to Judge Susan Bragg. On February 1, 1999, Judge Bragg transferred the case to the Chief

_____

[6] The copies of the docket sheet purportedly relating to the August 26th date are not completely legible; however, reference to the docket at the speedy trial hearing supports a finding that the following notation was made with regard to the August 26th hearing: "MOTIONS (CAP. MURDER) LYMON/ELLIOTT (ENTERED FROM JUDGE'S DOCKET BOOK)" (O.R. VIII, 1474, 1595; Tr. 5/26/2000, 146). In any event, the docket does not reflect what happened that day.

[7] The State supported its argument with an affidavit from an Assistant District Attorney George Burnett who was allegedly present at the August 26th hearing. While the affidavit was admitted as State's Exhibit 5, it is not included with the hearing transcript (Tr. 5/26/2000, 120-21). Another exhibit, State's Exhibit 7, was also admitted to support the State's contention that Mr. Burnett was in fact present that day (Tr. 5/26/2000, 146-47). It, too, is not included with the hearing transcript.

Judge for reassignment due to a conflict of interest.[8]   The case was assigned to

Judge Black (O.R. III, 452).  Lott, 98 P.3d at 360-61.

The initial hearing before Judge Black was set for March 1, 1999, but was continued

to March 18th.  The March 18th hearing was then continued until March 31st.  On

March 31st, it was continued again to October 29th, with a first trial setting of November 1st.

The docket does not indicate the reasons for the continuances (O.R. VIII, 1598).  In his order

denying Petitioner's speedy trial motion, Judge Black found that one of the continuances was

due to Petitioner's counsel not showing up.[9]  Judge Black also found that some motions were

heard on March 31st.  Lott, 98 P.3d at 361.

On September 28th, the State filed a motion for continuance.  The reason for the

continuance was the sending of hair evidence to LabCorp for DNA testing.[10]  The hair was

to be sent October 4th.  It appears that Petitioner objected to this continuance (O.R. VIII,

---

[8] Judge Bragg had been in the District Attorney's office when Mr. Miller was prosecuted and had assisted in his prosecution.

[9] At the hearing on Petitioner's speedy trial motion, Mr. Robertson acknowledged that he missed a court date, although he did not recall which one (Tr. 5/26/2000, 71-72).  Assistant District Attorney Greg Mashburn testified that the missed court date was either March 1st or March 18th (Tr. 5/26/2000, 133).

[10] In his Petition, Petitioner criticizes the State's need for additional DNA testing. Petitioner states, "It is important to note that at this time, the State already had DNA evidence implicating Mr. Lott from another DNA lab where Brian Wraxall had tested the evidence.  Brian Wraxall testified at preliminary hearing regarding his findings. (P.H. Tr. I, 27-35)."  Petition, p. 16.  This statement is incorrect.  At preliminary hearing, Mr. Wraxall testified for the State as a chain of custody witness only (P.H. Tr. 2/13/1998, 27-35). On cross-examination, Mr. Wraxall testified that he had never tested any of the evidence as it might relate to Petitioner (P.H. Tr. 2/13/1998, 38).

1479-80).[11]  Given that the docket reflects that the October 29th hearing was continued to March 24, 2000 (and the trial date moved to March 27th), it is apparent that the State's motion was granted (O.R. VIII, 1598).  In his order denying Petitioner's speedy trial motion, Judge Black found that the evidence was being submitted for a new type of DNA testing (mitochondrial) and that "[s]uch evidence results could be either inculpatory or exculpatory in nature and therefore necessary evidence to be presented at trial." Lott, 98 P.3d at 361.

On February 15, 2000, the State filed a second motion for continuance.  The reason for the continuance was again DNA testing because the hair samples sent to LabCorp in October 1999 were insufficient to render results.  Additional hair had been sent to LabCorp on February 9, 2000 (O.R. VIII, 1481).[12]  Petitioner filed a written objection to the continuance (O.R. VIII, 1482).  A hearing on the State's motion was held on February 17th.  Judge Black granted the continuance and the trial was continued for two weeks, or until April 10th (Tr. 2/17/2000, 11).[13]

---

[11] Both the motion and the objection are attached as exhibits to Petitioner's speedy trial motion. These documents are not otherwise found in the record. The objection is not file-stamped.

[12] In his Petition, Petitioner incorrectly states that the additional hair was not received by LabCorp until March 11, 2000.  Petition, pp. 16, 28, 32.  The record reflects that the additional hair was sent to LabCorp on February 9, 2000, before the State filed its continuance motion.  The hair was received by LabCorp by February 11, 2000 (Tr. 2/17/2000, 4, 20).

[13]  Because LabCorp anticipated consuming the whole sample, Petitioner was given the opportunity to have a defense expert present when the testing was conducted.  At the hearing, Petitioner requested time to consider whether or not to send an expert (Tr. 2/17/2000, 13-21).

On March 6th, the State filed a notice of trial conflicts (O.R. VIII, 1483-85).[14] On March 10th, the three judges presiding over the three trials causing the conflict issued an order resetting Petitioner's trial from April 10th to May 22nd (O.R. III, 464-66). Petitioner filed a written objection to this date change (O.R. VIII, 1488).[15]

On April 21st, Petitioner filed his speedy trial motion (O.R. VIII, 1416-94, 1603).[16] The hearing on the motion was originally set for May 5th, then May 22nd, and then May 26th. The hearing on May 5th was stricken because Petitioner's attorneys were unable to attend (O.R. VIII, 1603). Obviously, Petitioner's trial did not commence on May 22nd. In his order denying Petitioner's speedy trial motion, Judge Black found that the May 22nd trial date was stricken at Petitioner's request in order to produce evidence in support of his speedy trial motion. Lott, 98 P.3d at 359. The hearing on Petitioner's speedy trial motion was held on May 26th, and Judge Black issued his ruling denying the motion at a hearing held on June 2nd (Tr. 6/2/2000, 11).[17] At that hearing, Judge Black offered to hear the case the following Monday. However, the trial date was set for November 2000 so that Petitioner

---

[14] This file-stamped document is attached as an exhibit to Petitioner's speedy trial motion. It is not otherwise found in the record.

[15] See fn.14, supra.

[16] As with other record problems noted herein, this document was not found in the original court file. A copy (not file-stamped) was obtained from Petitioner's counsel and made a part of the record on appeal (O.R. VIII, 1497-1507).

[17] A written order was filed June 27th (O.R. III, 539-44).

could pursue a writ to the OCCA (Tr. 6/2/2000, 12-16). The OCCA denied the writ on August 15th (O.R. III, 549-51).

On October 2nd, the State filed another notice of trial conflicts (O.R. III, 554-56). This conflict was resolved at a hearing held on October 6th. Both cases causing the conflict belonged to Judge Black. Both were murder cases. While Petitioner's case was set for November 6th, the other case, Sanchez, was set for October 30th. It was determined that Petitioner's case would follow completion of the Sanchez trial and begin on Wednesday, November 8th (Tr. 10/6/2000, 20-21, 23).

In anticipation of Petitioner's trial starting November 8th, a motions hearing was held on Monday, November 6th. The docket also reflects that on the same day, Petitioner's trial was moved from Wednesday, November 8th, to Monday, November 13th (O.R. VIII, 1607). Then, on Thursday, November 9th, both parties appeared and requested a continuance by mutual agreement to 2001.[18] At his offering, Petitioner waived his speedy trial claim (Tr. 11/9/2000, 2-6). On November 15th, Petitioner's trial was set for March 26, 2001 (O.R. VIII, 1607).

On March 9, 2001, Petitioner filed a motion to dismiss (or in the alternative to exclude DNA evidence) due to the State's alleged failure to provide discovery (O.R. IV, 752-

---

[18] Petitioner asserts that this continuance was necessitated by the State's failure to comply with discovery. Petition, pp. 17, 28. The record does not support this assertion. At the November 9th hearing, Petitioner's counsel, John Albert, requested a continuance. Mr. Albert advised the trial court that "everyone's been busy" and that they "have tried very hard to work this case out[,]" but that "both sides have come to the mutual agreement that we would like to put this trial some time in the year the [sic] 2001" (Tr. 11/9/2000, 2).

57). A hearing was held on the motion that same day. Judge Black found no discovery violation and denied the motion (Tr. 3/9/2001, 37-40).

In preparation for trial on March 26th, motion hearings were held on March 22nd and 23rd. At the March 22nd hearing, the defense argued a motion requesting in camera review of the personnel files of Joyce Gilchrist. Ms. Gilchrist, an employee of the Oklahoma City Police Lab, was in charge of the evidence in Petitioner's case. Anticipating Ms. Gilchrist to testify as a chain of custody witness,[19] the defense sought review of her personnel file for impeachment evidence. In granting the motion, Judge Black noted the "cloud" hanging over Ms. Gilchrist. At this time, Ms. Gilchrist's work was being scrutinized and she had been placed on administrative leave (O.R. IV, 787-93; Tr. 3/22/2001, 51-64). At the March 23rd hearing, Judge Black advised that he had reviewed Ms. Gilchrist's personnel file and found a single relevant document, namely, a letter placing Ms. Gilchrist on paid suspension pending an investigation into her laboratory practices. The letter was to be provided to the defense (Tr. 3/23/2001, 70-75).

On the morning of trial, the defense received copies of two letters regarding Ms. Gilchrist. The first was the letter from her personnel file referenced at the hearing held on March 23rd. The second was a letter to District Attorney Bob Macy from Oklahoma City Police Chief M.T. Berry. In this letter dated February 22, 2001, Chief Berry advises District

---

[19] Ms. Gilchrist did not perform any of the DNA tests which implicated Petitioner. She was only involved "as to the chain of custody issues on when items were received, how they were treated, where they were stored, and where they went out" (Tr. 3/22/2001, 58-59).

Attorney Macy that Ms. Gilchrist is involved in a couple of pending murder trials and that her involvement may raise issues of concern (Tr. 3/26/2001, 2, 8).[20]  Based on the contents of the letters, the defense, compelled to conduct additional investigation, requested a continuance.  Petitioner argued that the request was forced by the State's delayed delivery of the February 22nd letter which he asserted could lead to potentially exculpatory evidence (Tr. 3/26/2001, 24-25, 31-34, 38-39).  Judge Black concluded otherwise, finding that the defense had been aware of the issues with Ms. Gilchrist for some time and that the continuance was the result of their failure to thoroughly investigate (Tr. 3/26/2001, 45).[21]  Trial was continued to September 10th (Tr. 3/26/2001, 39-40, 45-47).

Between March 26th and August 30th, four hearings were held.  These hearings, held April 6th, May 2nd, August 15th, and August 20th, concerned Ms. Gilchrist (and related discovery) and the State's request to obtain a sample of Petitioner's blood.  On August 30th, a status hearing was held in which Judge Black advised the parties that he was currently

---

[20] Neither letter is included with the hearing transcript.

[21] In its decision, the OCCA stated, "The record reflects that certain delays from the November 2000 trial date to October 2001 when the first trial began were the result of the State failing to timely comply with the Discovery Code." Lott, 98 P.3d at 330.  While the OCCA indicates that these discovery violations were remedied by the trial court's granting of continuances, it does not specify what the discovery violations were and the Court cannot find any trial court rulings finding a discovery violation. As discussed above, see fn.18, supra, the record reflects that the November 2000 trial date was continued to March 2001 not for a discovery violation, but by agreement of the parties. As for the March 9, 2001 hearing, although it concerned an alleged discovery violation, the trial court found none. Finally, while the letter concerning Ms. Gilchrist dated February 22, 2001, was not delivered to the defense until March 26, 2001, the trial court made no finding that the State had failed to comply with discovery.  The trial court explicitly found that the continuance was necessitated by the defense's failure to investigate.

trying a murder case and that it was going to run through the September 10th trial date set for Petitioner. Petitioner's trial was moved to October 29th (Tr. 8/30/2001, 2, 12).[22]

A pretrial hearing was held on Friday, October 26th, and Petitioner's first trial began on Monday, October 29th. On Tuesday, November 6th, the sixth day of trial, the medical examiner, Dr. Larry Balding, testified. Through his testimony, it was revealed that the medical examiner's office had retained vaginal slides from the autopsies of both victims. These slides, which contained spermatazoa, had continually been in the medical examiner's custody (I Trial Tr. VI, 914, 923-25, 930-33, 975-77, 980, 991-92). Thus, unlike the other evidence, Ms. Gilchrist had no involvement. The trial court recessed the jury for a week and the slides were tested. Although the testing of Mrs. Cutler's slide was inconclusive, the testing of Mrs. Fowler's slide implicated Petitioner (I Trial Tr. VI, 1042-43, 1086). This development ultimately resulted in a mistrial being declared on November 13th, and a new trial set for December 3rd (I Trial Tr. VI, 1122). Petitioner's present convictions and sentences are the result of this second trial.

---

[22] Regarding the continuances between November 2000 and October 2001, the OCCA found that the November 2000 trial date was continued three times (March 26, 2001; September 10, 2001; and October 29, 2001) due to additional forensic testing. Lott, 98 P.3d at 330. This is incorrect. As set forth herein, the trial was continued from November 2000 to March 2001 by agreement of the parties. The March 2001 trial date was continued to September 2001 because Petitioner needed additional time to investigate the issues surrounding Ms. Gilchrist. Finally, the September 2001 trial date was continued to October 2001 because of a scheduling conflict in Judge Black's docket.

**3.      Barker Analysis.**

**a.      Length of the Delay.**

Evaluation of the first Barker factor determines whether examination of other factors is necessary.  "Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance." Barker, 407 U.S. at 530. The right to a speedy trial attaches when an information is filed. United States v. Marion, 404 U.S. 307, 320 (1971). See also United States v. MacDonald, 456 U.S. 1, 7 (1982) ("[N]o Sixth Amendment right to a speedy trial arises until charges are pending."). "[T]he Speedy Trial Clause has no application after the Government, acting in good faith, formally drops charges." MacDonald, 456 U.S. at 7.

Petitioner contends that the start date for assessment of his speedy trial claim should be March 10, 1995, the date he was first charged.  Therefore, Petitioner asserts that the length of the delay was six years and eight months (March 10, 1995 to December 3, 2001). Petitioner further asserts that because the OCCA counted from March 19, 1997, the date charges were refiled against him, and determined the delay to be approximately four years and ten months, the OCCA's decision is an unreasonable application of MacDonald. Respondent asserts that the OCCA did not unreasonably apply MacDonald.  Respondent further asserts that the OCCA reasonably applied Barker in determining that the delay was substantial, warranting review of the other Barker factors.

20

In MacDonald, a military physician killed his wife and two daughters on an Army base in February 1970.  The Army charged MacDonald with the murders, but ultimately dismissed the charges in October 1970.  MacDonald was honorably discharged from the Army in December 1970.  MacDonald, 456 U.S. at 3-5.  Continuing its investigation even after dismissal of the charges, the Army submitted its investigative reports to the Justice Department in 1972 and 1973.  In August 1974, the Justice Department presented the case to a grand jury.  In January 1975, almost five years after the murders and over four years after the military charges were dismissed, MacDonald was indicted for the murders in federal district court.  Id. at 5.

In MacDonald, the Supreme Court disagreed with the Court of Appeals that the entire period from MacDonald's military arrest to his subsequent indictment on civilian charges should be counted in determining his speedy trial claim.  The Court reasoned as follows:

> In this case, the homicide charges initiated by the Army were terminated less than a year after the crimes were committed; after that, there was no criminal prosecution pending on which MacDonald could have been tried until the grand jury, in January 1975, returned the indictment on which he was tried and convicted. During the intervening period, MacDonald was not under arrest, not in custody, and not subject to any "criminal prosecution." Inevitably, there were undesirable consequences flowing from the initial accusation by the Army and the continuing investigation after the Army charges were dismissed. Indeed, even had there been no charges lodged by the Army, the ongoing comprehensive investigation would have subjected MacDonald to stress and other adverse consequences. However, once the charges instituted by the Army were dismissed, MacDonald was legally and constitutionally in the same posture as though no charges had been made. He was free to go about his affairs, to practice his profession, and to continue with his life.

Id. at 9-10 (footnotes omitted).

MacDonald stands for the proposition that "[o]nce charges are dismissed, the speedy trial guarantee is no longer applicable." Id. at 8. As in MacDonald, charges against Petitioner were filed, dismissed, and then refiled. Given the applicability and holding of MacDonald, the OCCA cannot be found to have unreasonably applied it to Petitioner's case.[23] See Metoyer v. Scott, 70 Fed.Appx. 524, 530 (10th Cir. 2003) (unpublished) (citing MacDonald and concurring with the OCCA that the relevant speedy trial time frame began with the filing of the second indictment). Counting from March 19, 1997, the date charges were refiled, the OCCA concluded that the speedy trial time frame was both "substantial" and "sufficient" to necessitate further review. Lott, 98 P.3d at 328. As the OCCA found, this Court also concludes that the first factor weighs in favor of Petitioner.

b.    **Reason for the Delay.**

Because "different weights should be assigned to different reasons[,]" the reasons for the delay must be evaluated and assessed against the responsible party. Barker, 407 U.S. at 531. If the State makes deliberate attempts to delay a defendant's trial, this delay is weighed heavily against it. "A more neutral reason such as negligence or overcrowded courts should be weighted less heavily [against the State] but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with

---

[23] In MacDonald, the Supreme Court expressly noted that this holding is not contrary to its decision in Klopfer v. North Carolina, 386 U.S. 213 (1967). Klopfer involved "an unusual state procedure" whereby "a prosecutor was able to suspend proceedings on an indictment indefinitely." The difference in Klopfer, therefore, was that the charges were never dismissed. MacDonald, 456 U.S. at 8 n.8. The OCCA applied MacDonald and found that Petitioner's reliance on Klopfer was misplaced. Lott, 98 P.3d at 328.

the defendant." Id. Somewhat intertwined with a defendant's assertion of the right is his involvement in the delays. Id. at 528-29, 531 ("We hardly need add that if delay is attributable to the defendant, then his waiver may be given effect under standard waiver doctrine. . . ."). Delays attributable to the defendant should weigh against him. United States v. Dirden, 38 F.3d 1131, 1138 (10th Cir. 1994). See also Cheadle v. Dinwiddie, 278 Fed.Appx. 820, 824 (10th Cir. 2008) (unpublished) (considering the defendant's responsibility in the delay and finding the delay "understandable and reasonable" where most of the delay was attributable to the defendant); Tillman v. Kansas, 274 Fed.Appx. 706, 708 (10th Cir. 2008) (unpublished) (finding that the state court did not act unreasonably in determining a petitioner's speedy trial claim when the state court weighed the second Barker factor against the petitioner due to his contribution to the delays). Finally, delay may be appropriate where there are valid reasons justifying it. Barker, 407 U.S. at 531.

Consistent with his earlier assertion, Petitioner begins his analysis of the second Barker factor with March 10, 1995, the date charges were first filed against him. From that date, he argues that there were twenty-five continuances in his case and that he was only responsible for one. Respondent relies heavily upon the trial court's findings of facts, asserting that they are entitled to a presumption of correctness in this proceeding.[24] Respondent also argues that the OCCA's determination of this factor is reasonable.

---

[24] The Court agrees. The trial court's findings of facts, which cover the period from the initial filing of charges to June 2000, are supported by the record and presumed correct.

In finding the second <u>Barker</u> factor in favor of the State, the OCCA concluded as follows:

> We agree with the trial court's finding that the delay in this case was not solely attributable to the State. The State, the defense, and the court can all be held accountable for delays in this case. However, on the record, the majority of the delays were for good cause and not deliberate attempts to slow the process by either party. Considering the complexity of this case, the discovery of the availability of the new mitochondrial analysis of DNA evidence during the pendency of the proceedings, the majority of the delays were necessary to further the ends of justice and ensure that [Petitioner] received a fair and impartial trial.

<u>Lott</u>, 98 P.3d at 331. While the Court disagrees with the some of the OCCA's characterizations of the reasons for the delay, it finds that its ultimate conclusion is not unreasonable.

Two continuances were requested by the State for DNA testing. The testing performed, mitochondrial DNA, was new technology previously unavailable. <u>See</u> Kiran Bisla, <u>It All Came Down to a Single Hair: The Probability of Exclusion vs. the Probability of Guilt Through the Use of Mitochondrial DNA Evidence in State v. Pappas</u>, 26 Whittier L. Rev. 263, 290-92 (2004) (citing a 1996 Tennessee appellate court case as the "landmark case [which] started the trend for more courts to consider the use of [mitochondrial DNA] evidence[,]" and noting that on October 1, 1998, the FBI began using mitochondrial DNA "for any and all cases that might need the analysis"). Because the results of this testing could have proved either inculpatory or exculpatory, it was reasonable for the State to pursue it. While Petitioner criticizes the State for the extensive DNA testing performed, it was

understandable for the State to proceed cautiously in this prosecution, given that Mr. Miller had been previously convicted of the crimes, sentenced to death, and then later exonerated through DNA testing.  See Berger v. United States, 295 U.S. 78, 88 (1935) (noting that the goal of the prosecutor is not to win case, but see that justice is done; "As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer.").

The defense played a part in the delay as well.  While little progress was made in Petitioner's case in 1998, Petitioner's failure to timely seek preparation of the preliminary hearing transcripts contributed to this delay.  Petitioner was bound over on March 20, 1998, but waited almost four months, or until July 15, 1998, before obtaining an order to have the preliminary hearing transcripts prepared.  The final transcript was not filed until September 21, 1998, six months after Petitioner's bind over.  As the trial court found, it was reasonable to wait for completion of the preliminary hearing transcripts before taking up pretrial motions.  Lott, 98 P.3d at 360. With the final transcript not filed until late September, the earliest the case could have been tried before Judge Owens was in October.  The Court concurs with the findings of both the trial court and the OCCA that, given the nature of the case and Judge Owens' docket, Judge Owens could not have tried Petitioner's case prior to his retirement.  Lott, 98 P.3d at 329, 360.

Much of the year 2000 was afforded to litigation of Petitioner's speedy trial motion. Petitioner filed the motion in April 2000, a hearing on the motion was held in May, and it

was denied in June. Although the case could have been tried in June 2000, the case was continued until November 2000 to allow Petitioner to pursue a mandamus action to the OCCA. While Petitioner was understandably seeking to remedy what he believed was a constitutional infringement, it was not unreasonable for the OCCA to weigh this delay against him. Lott, 98 P.3d at 330. See United States v. Loud Hawk, 474 U.S. 302, 316 (1986) ("A defendant who resorts to an interlocutory appeal normally should not be able upon return to the district court to reap the reward of dismissal for failure to receive a speedy trial."). Also, the additional delay from November 2000 to March 2001 may not have been solely attributable to Petitioner, but since Petitioner requested the continuance, asserted that the request was one of mutual agreement, and voluntarily waived his speedy trial claim as to this continuance, he bears some responsibility for the four-month delay it caused.

Some of the delay was due to the trial court's crowded criminal docket and the caseload of the prosecutors. In 1999, there was some delay in reassigning Petitioner's case after Judge Owens' retirement. While the initial hearing before Judge Black was set for March 1, 1999, there were ultimately three continuances in March, the last resulting in a first trial setting of November 1, 1999. Although one of the early continuances can be attributed to the absence of Petitioner's counsel, the reason for the additional delay is unknown. In 2000, the State filed two notices of trial conflicts, and both caused delays in Petitioner's trial. While the second caused a delay of only a week, the first resulted in a six-week delay. In addition, in 2001, the trial court's schedule caused Petitioner's trial to be bumped seven

weeks from September 10th to October 29th.  In accordance with <u>Barker</u>, these delays, although not heavily weighted, are assessed against the State.  <u>Barker</u> 407 U.S. at 531.  <u>See also</u> <u>Doggett v. United States</u>, 505 U.S. 647, 657 (1992) ("Although negligence is obviously to be weighed more lightly than a deliberate intent to harm the accused's defense, it still falls on the wrong side of the divide between acceptable and unacceptable reasons for delaying a criminal prosecution once it has begun.").

Six months of delay in 2001 (March 26th to September 10th) related to Ms. Gilchrist, the allegations surrounding her competence and her involvement in Petitioner's case.  While Petitioner continues to assert that this delay should be attributed to the State for untimely disclosure of the February 22nd letter from Police Chief Berry to District Attorney Macy, the contents of this letter are unknown.  Therefore, the Court has no reason to dispute the trial court's finding that the need for the continuance was not due to the receipt of any new information about Ms. Gilchrist, but a defense failure to investigate the matter based on information already known about her.  Nevertheless, it is difficult to fault Petitioner for this delay given that the information about Ms. Gilchrist was just surfacing and she was in fact involved in Petitioner's case.  Because this was a DNA case, it was reasonable to conduct additional investigation.

For all these reasons, the Court finds that the OCCA did not unreasonably determine that the second <u>Barker</u> factor, the reason for the delay, weighs against Petitioner.  Applying the deference of the AEDPA, the Court cannot conclude that the OCCA acted unreasonably

in determining the issue, especially in the absence of any evidence of deliberate delay by the State.

### c. Assertion of the Right.

The OCCA found this factor in Petitioner's favor. In particular, the OCCA held:

> As for the third factor, assertion of the right by the accused, incarceration makes the demand for one in custody. See McDuffie, 1982 OK CR 150, ¶ 8, 651 P.2d at 1056. Additionally, [Petitioner] made an affirmative request for a speedy trial on at least nine different occasions. As we noted in Ellis, 2003 OK CR 18, ¶ 45, 76 P.3d at 1139, "the defendant's assertion of his speedy trial right, then, is entitled to strong evidentiary weight in determining whether the defendant is being deprived of the right" (quoting Barker, 407 U.S. at 531-32, 92 S.Ct. at 2192-93). The third factor weighs in [Petitioner's] favor.

Lott, 98 P.3d at 331. Neither Petitioner nor Respondent question this determination. Accordingly, and after independent review of the state court record, the Court determines that the OCCA reasonably determined this factor.

### d. Prejudice.

"Prejudice . . . should be assessed in the light of the interests of defendants which the speedy trial right was designed to protect." Barker, 407 U.S. at 532. These interests are: "(I) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired." Id. Of these, the last is of the greatest concern "because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." Id.

Petitioner asserts that the delay caused him actual prejudice. While Petitioner makes general assertions that prejudice was inherent[25] in his lengthy incarceration[26] and that several DNA chain of custody witnesses were lost[27], Petitioner's primary arguments for prejudice are that the delay (1) gave the State time to improve its case against him; and (2) hampered his ability to obtain mitigation records and locate mitigation witnesses. Respondent contends that the OCCA reasonably applied <u>Barker</u> in finding that "[w]hile [Petitioner] suffered some prejudice as a result of the deprivation of his liberty, this is not sufficient to tip the scales in [Petitioner's] favor." <u>Lott</u>, 98 P.3d at 332.

The record confirms that the State's DNA case against Petitioner did in fact improve over time. In 1994, DNA testing first implicated Petitioner (II Trial Tr. V, 1332-34). While the first testing was done using six genetic systems, additional testing was conducted in 1996

---

[25] In <u>Jackson</u>, the Tenth Circuit acknowledged that a defendant could satisfy the prejudice factor without a particularized showing of prejudice. "In cases of extreme delay, criminal defendants need not present specific evidence of prejudice. Instead, they may rely on the presumption of prejudice created by the delay." <u>Jackson</u>, 390 F.3d at 1263 (citing <u>Doggett</u>, 505 U.S. at 655). In <u>Doggett</u>, the extreme delay was eight and a half years, of which the government was responsible for six. <u>Id.</u> In <u>Jackson</u>, the Tenth Circuit acknowledged that "<u>Doggett</u> does not definitively determine whether a delay of less than six years will ever relieve a defendant of the need to make a particularized showing of prejudice[,]" and it left open the issue for later resolution. <u>Jackson</u>, 390 F.3d at 1264 n.4. In the present case, the delay was less than six years, even if the ten-month period of the original filing is considered. Petitioner's calculation of the delay as six years and eight months includes the fourteen-month period when no charges were pending. <u>But</u> <u>see</u> <u>MacDonald</u>, 456 U.S. at 7 (the applicable period for speedy trial assessment is when charges are pending).

[26] Petitioner was incarcerated for the Marshall/Hoster rapes until February 13, 1998 (O.R. VIII, 1468). Therefore, from February 1998 to December 2001, Petitioner was held solely on the Fowler/Cutler charges.

[27] Petitioner provides no support for this assertion. Petitioner does not detail the lost witnesses nor does he provide any explanation as to how his defense was hampered by their absence.

using eight genetic systems. This subsequent testing rendered the following results: "the probability of randomly selecting an unrelated individual in the general populations with a profile consistent with those samples which matched the profile of [Petitioner] is approximately 1 in 701,000 for the African-American population . . . " (P.H. Tr. 1/30/1998, 30-34). In July of 2001, testing for thirteen genetic systems became available and the statistical probabilities increased from 1 in 701,000 to 1 in 15.7 quadrillion[28] (II Trial Tr. VI, 1077-83, 1106-09).[29] This was obviously harmful to Petitioner's defense, but Petitioner has not shown that the State made deliberate attempts to delay the trial in order to improve its case. See Barker, 407 U.S. at 531 n.32 ("[I]t is improper for the prosecution intentionally to delay 'to gain some tactical advantage over (defendants) or to harass them.'") (quoting Marion, 404 U.S. at 325). From the first statistical rendering, the DNA evidence against Petitioner was strong. Although the statistical probabilities did improve to virtual certainty, this was the result of advancing technology, not any apparent intention by the State to make its already strong case stronger. As the OCCA found,

> In the present case, all of the evidence had been gathered, no new evidence was sought. It was merely a question of analyzing that evidence in the most accurate method possible.

Lott, 98 P.3d at 332.

---

[28] $15.7 \times 10^{15}$ (II Trial Tr. V, 1023-24) ("It goes hundreds, thousands, millions, billions, trillions, quadrillions. . . . It's a lot.").

[29] The testing of the medical examiner's vaginal slide for Mrs. Fowler in November 2001 rendered the same result (II Trial Tr. V, 1022-24).

Although the test results inculpated Petitioner, there was the possibility of exculpation.

As the Supreme Court has acknowledged, "DNA testing has an unparalleled ability both to

exonerate the wrongly convicted and to identify the guilty. It has the potential to significantly

improve . . . the criminal justice system. . . ." <u>District Attorney's Office for Third Judicial</u>

<u>Dist. v. Osborne</u>, ___ U.S. ___, 129 S.Ct. 2308, 2312 (2009). The OCCA recognized this

as well.

> [T]he science of DNA testing is rapidly progressing and it was to the benefit
> of both the State and the defense to have the evidence subjected to the latest
> and most accurate type of analysis. Such testing could have very easily been
> exculpatory and therefore benefited [sic] [Petitioner]. The fact that the results
> proved favorable to the State and not [Petitioner] is not grounds upon which
> to base a finding of prejudice.

<u>Lott</u>, 98 P.3d at 332.

As to Petitioner's additional argument regarding mitigation evidence, the OCCA

found that it lacked support, and Petitioner presents nothing more to this Court.[30] The sum

of Petitioner's argument is that he "was unable to obtain important evidence such as juvenile

records, hospital records, and contact with friends and family that would have been helpful

to a jury in determining his punishment." Petition, p. 36. As the OCCA found, this bare

allegation, without more, this is not a demonstration of prejudice. <u>Lott</u>, 98 P.3d at 332.

---

[30] In additional language taken from Petitioner's direct appeal brief, Petitioner states that "fourteen years to the day . . . transpired since the first homicide and [his] trial." Petition, p. 36. The first homicide occurred September 2, 1986. Petitioner's first trial began October 29, 2001, and his second trial on December 3, 2001. While not material to the argument, the error is a glaring distraction. It is a prime example of why habeas counsel should exercise caution in lifting language from state court pleadings.

For the foregoing reasons, the Court finds that the OCCA's determination of the fourth Barker factor is reasonable. On the issue of prejudice, it was not unreasonable for the OCCA to weigh this factor in favor of the State.

**e.      Balancing.**

As previously stated, "[h]abeas relief is only available if there is *no possible* balancing of the factors that both supports the OCCA's ultimate decision and is not contrary to clearly established Supreme Court precedent." Jackson, 390 F.3d at 1266-67 (emphasis added). The OCCA found the first and third factors in favor of Petitioner and the second and fourth factors in favor of the State. Lott, 98 P.3d at 333. After careful review, the Court has found that the OCCA did not unreasonably determine the Barker factors. Likewise, the Court cannot fault the OCCA's ultimate conclusion, especially in light of the high deference due it. Petitioner is not entitled to federal habeas relief on a claim that his constitutional right to a speedy trial was violated.

**4.      Statutory Violation.**

In addition to his Sixth Amendment speedy trial claim, Petitioner asserts that his right to a speedy trial, as defined by Oklahoma statutory law, was violated. Respondent has not specifically addressed this argument, but argued only that the OCCA's decision on Petitioner's Ground One is not contrary to or an unreasonable application of clearly established federal law. For substantially the same reasons espoused in its denial of

Petitioner's federal constitutional claim, the OCCA concluded that Petitioner was not entitled to relief based upon a statutory violation. Lott, 98 P.3d at 333.

"[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." Estelle v. McGuire, 502 U.S. 62, 67-68 (1991). Habeas relief is available to a state prisoner only upon a showing that "he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). See also 28 U.S.C. § 2254(d)(1) (requiring a petitioner to show that a state court decision is contrary to or an unreasonable application of "clearly established Federal law, as determined by the Supreme Court of the United States"). Therefore, this portion of Petitioner's Ground One which is based upon an alleged violation of Oklahoma statutes is not properly before the Court.

### 5. Due Process Violation.

Because the OCCA applied MacDonald and did not, for speedy trial purposes, consider the fourteen months between dismissal of the initial charges and refiling, Petitioner asserts that this delay resulted in a violation of his due process rights. Again, Respondent has not specifically addressed this argument, but argued only that the OCCA's decision on Petitioner's Ground One is not contrary to or an unreasonable application of clearly established federal law. In excluding time before the charges were refiled on March 19, 1997, the OCCA found that "no due process violation occurred." Lott, 98 F.3d at 328.

"[T]he Due Process Clause has a limited role to play in protecting against oppressive delay." United States v. Lovasco, 431 U.S. 783, 789 (1977). "[P]reindictment delay is not a violation of the Due Process Clause absent a showing of actual prejudice and that the delay was purposefully caused by the government to gain tactical advantage or to harass." Perez v. Sullivan, 793 F.2d 249, 259 (10th Cir. 1986). "Vague and conclusory allegations of prejudice resulting from the passage of time and the absence of witnesses are insufficient to constitute a showing of actual prejudice. Defendant must show definite and not speculative prejudice, and in what specific manner missing witnesses would have aided the defense." United States v. Trammell, 133 F.3d 1343, 1351 (10th Cir. 1998). "A defendant bears the burden of proof that the delay caused substantial prejudice to his right to a fair trial and that the delay was for the purpose of gaining a tactical advantage over him." Perez, 793 F.2d at 259 (citing Marion, 404 U.S. at 324).

In support of this claim, Petitioner relies upon argument previously presented in support of his Barker claim. Petitioner asserts that he has demonstrated that the prosecution's motives were suspect and he was substantially prejudiced. For substantially the same reasons already discussed in denying Petitioner's Barker claim, the Court finds that Petitioner has failed to show that the decision of the OCCA finding no due process violation is unreasonable. The delay in Petitioner's case was not one-sided and Petitioner has not shown that the prosecution caused delay to gain a tactical advantage. Petitioner has also not shown actual prejudice. Therefore, this claim for relief must also fail.

### 6. Eighth Amendment Violation.

Petitioner's final argument with respect to his Ground One is that because his constitutional right to a speedy trial was infringed, he was also denied a fair sentencing proceeding under the Eighth Amendment. It is Petitioner's contention that, due to the delay, the State was able to obtain evidence against him which was used to support his death sentences. Again, Respondent has not specifically addressed this argument, but argued only that the OCCA's decision on Petitioner's Ground One is not contrary to or an unreasonable application of clearly established federal law. Petitioner did raise this claim to the OCCA and the OCCA denied relief. The OCCA ruled that because there was no constitutional infringement of Petitioner's speedy trial right, the evidence admitted against him was not "unconstitutionally obtained." Lott, 98 P.3d at 333 n.8.

"The foremost concern of the Eighth Amendment is that the death sentence not be imposed in an arbitrary and capricious manner." Saffle v. Parks, 494 U.S. 484, 507 (1990) (Brennan, J., dissenting). As the OCCA found, no Eighth Amendment violation occurred in this case. As noted above, Petitioner's Eighth Amendment argument is based upon his contention that his right to a speedy trial was infringed. Because the OCCA found no constitutional speedy trial violation, and because this Court has determined that decision to be reasonable, it follows that the OCCA's additional finding that Petitioner's sentencing proceeding was not tainted by the admission of unconstitutionally obtained evidence is also reasonable.

### 7.    Conclusion.

For the reasons detailed herein, Petitioner has not demonstrated his entitlement to relief based upon a delay in his trial.  Accordingly, Petitioner's Ground One is denied.

### B.    Ground Two:    Joinder of Offenses.

In his Ground Two, Petitioner complains about the joinder of offenses.  It is Petitioner's contention that he should have been tried separately for the crimes against Mrs. Fowler and Mrs. Cutler.  Although the majority of Petitioner's claim relates to the application and interpretation of Oklahoma's statute on joinder, Okla. Stat. tit. 22, § 436 (2001), Petitioner also asserts a due process violation.  Respondent asserts that the OCCA's decision is not contrary to or an unreasonable application of Supreme Court law.

In addressing Petitioner's claim, the OCCA addressed only the state law claim.  Lott, 98 P.3d at 333-34.  This is understandable given that Petitioner did not adequately plead a constitutional due process claim.[31]  See Bland v. Sirmons, 459 F.3d 999, 1011 (10th Cir. 2006) ("'Fair presentation' means that the petitioner has raised the 'substance' of the federal claim in state court.") (quoting Picard v. Conner, 404 U.S. 270, 278  (1971)).  The portion of Petitioner's claim which relies upon state law is not properly before this Court, Webber v. Scott, 390 F.3d 1169, 1177 n.5 (10th Cir. 2004), and for the reasons set forth below, Petitioner's due process claim is without merit.  See 28 U.S.C. § 2254(b)(2) ("An application

---

[31] In the proposition heading for this claim on direct appeal, Petitioner asserted that the joinder violated his Fifth and Fourteenth Amendment rights. The argument, however, focused exclusively on Section 436.  Only twice, and in summary fashion, did Petitioner make any reference to due process.  Brief of Appellant, Case No. D-2002-88, pp. 28-31.

for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.").

In United States v. Lane, the Supreme Court acknowledged that "[i]mproper joinder does not, in itself, violate the Constitution. Rather, misjoinder would rise to the level of a constitutional violation only if it results in prejudice so great as to deny a defendant his Fifth Amendment right to a fair trial." Lane, 474 U.S. 438, 446 n.8 (1986). See Lucero v. Kerby, 133 F.3d 1299, 1314 (10th Cir. 1998) (quoting Lane and requiring a habeas petitioner to show the denial of a fundamentally fair trial in order to obtain relief for improper joinder). "Such prejudice may arise when there is a great disparity in the amount of evidence supporting the charges or when the jury is likely to confuse the evidence or infer a criminal disposition on the part of the defendant." Webber, 390 F.3d at 1178.

A review of the record reveals that Petitioner was not prejudiced by the joinder of charges. Petitioner was implicated in both murders based on DNA evidence, the statistical probability of which was the same in both cases (1 in 15.7 quadrillion). In addition to the absence of disparate evidence between the counts, there is also no indication that the jury was confused by the presented evidence or inferred guilt between the counts. In considering the evidence, the jury was specifically instructed to consider the two counts separately, giving "separate thought and deliberation" to each (O.R. VII, 1213). There is no reason to believe that the jury did not follow this instruction. See Weeks v. Angelone, 528 U.S. 225, 234 (2000) ("A jury is presumed to follow its instructions."). Finally, as the OCCA found,

even if the counts had been severed, "[e]vidence of either offense would have been admissible in a trial of the other . . . as evidence of other crimes or wrongs to prove motive, intent, or common scheme or plan." Lott, 98 P.3d at 334.

In conclusion, Petitioner is not entitled to relief on his Ground Two. The state law portion of Petitioner's claim is not properly before the Court, and the constitutional aspect lacks merit. Accordingly, Ground Two is denied.

## C.    Ground Three:    Other Crimes Evidence.

In his Ground Three, Petitioner complains about the admission of other crimes evidence. Petitioner's particular complaint is that evidence of the Marshall/Hoster rapes should not have been admitted against him. Petitioner raised this claim on direct appeal. The OCCA denied relief, finding that the evidence was properly admitted and that its probative value outweighed its prejudicial impact. Lott, 98 P.3d at 334-36. Respondent supports the OCCA's decision and argues that Petitioner should be denied relief because he has not shown that the OCCA's decision is contrary to or an unreasonable application of Supreme Court law.

Claims concerning the admission of other crimes evidence are evaluated for fundamental fairness. The question is not "whether this evidence was admissible under state law, but instead whether, considered in light of the entire record, its admission resulted in a fundamentally unfair trial." Knighton v. Mullin, 293 F.3d 1165, 1171 (10th Cir. 2002). Relief will be warranted only when "'the probative value of such evidence is so greatly

outweighed by the prejudice flowing from its admission. . . .'" Id. (quoting Duvall v. Reynolds, 139 F.3d 768, 787 (10th Cir. 1998)). See also Welch v. Sirmons, 451 F.3d 675, 688 (10th Cir. 2006) (quoting Knighton).

In addressing Petitioner's claim, the OCCA detailed the applicable law governing admission of other crimes evidence in Oklahoma.

> The basic law is well established-when one is put on trial, one is to be convicted-if at all-by evidence which shows one guilty of the offense charged; and proof that one is guilty of other offenses not connected with that for which one is on trial must be excluded. Burks v. State, 1979 OK CR 10, ¶ 2, 594 P.2d 771, 772, *overruled in part on other grounds*, Jones v. State, 1989 OK CR 7, 772 P.2d 922. See also Hall v. State, 1985 OK CR 38, ¶ 21, 698 P.2d 33, 37. However, evidence of other crimes is admissible where it tends to establish absence of mistake or accident, common scheme or plan, motive, opportunity, intent, preparation, knowledge and identity. Burks, 1979 OK CR 10, ¶ 2, 594 P.2d at 772. To be admissible, evidence of other crimes must be probative of a disputed issue of the crime charged, there must be a visible connection between the crimes, evidence of the other crime(s) must be necessary to support the State's burden of proof, proof of the other crime(s) must be clear and convincing, the probative value of the evidence must outweigh the prejudice to the accused and the trial court must issue contemporaneous and final limiting instructions. Welch v. State, 2000 OK CR 8, ¶ 8, 2 P.3d 356, 365, cert. denied, 531 U.S. 1056, 121 S.Ct. 665, 148 L.Ed.2d 567 (2000).

Lott, 98 P.3d at 334-35. The Tenth Circuit has acknowledged that these rules governing admission are consistent with federal constitutional principles "in that they acknowledge the prejudice associated with the admission of other crimes evidence and place strict limitations on the admission of such evidence." Welch, 451 F.3d at 688.

On September 1, 1987, Petitioner pled guilty to the crimes of burglary and rape committed against Mrs. Marshall and Mrs. Hoster (II Trial Tr. VII, 1379-80, 1423). On

March 22, 1987, between 7:00 and 8:00 in the morning, Petitioner broke into Mrs. Marshall's home located at 2700 Northwest 16th Street in Oklahoma City (II Trial Tr. VII, 1346-47, 1377). Mrs. Marshall's home was on the corner on the south side of the street (II Trial Tr. VII, 1365). Mrs. Marshall was an elderly woman (II Trial Tr. VII, 1347; State's Exhibit 228). Although Petitioner entered the house through a rear window, there was evidence that he attempted to enter in through the back screen door (II Trial Tr. VII, 1348, 1366-67, 1372-73; State's Exhibits 216 and 218). Although Mrs. Marshall tried to call the police, her phone did not work because the electricity had been cut off at the outside breaker box (II Trial Tr. VII, 1348-50, 1366-67). Petitioner attacked Mrs. Marshall and took her into her bedroom where he raped her. Petitioner bound her with material and tried to smother her with a pillow (II Trial Tr. VII, 1348, 1368-69; II Trial Tr. 12/13/01, 34; State's Exhibits 210 and 211). Petitioner threatened Mrs. Marshall not to tell anyone, took some money from her purse which was lying on the bed, and left through the front door (II Trial Tr. VII, 1349). Mrs. Marshall had blood and bruising on her mouth, bruises on her arms, and a broken finger (II Trial Tr. VII, 1351-52, 1356; State's Exhibits 223 through 228). Her vaginal area was smeared with blood and she had cuts around the opening of her vagina (II Trial Tr. II, 1356).

On May 7, 1987, around 3:00 in the morning, Petitioner broke into Mrs. Hoster's home located at 3344 Northwest 20th in Oklahoma City. Mrs. Hoster's home was on the corner on the south side of the street (II Trial Tr. VII, 1381-83). Mrs. Hoster was 71 years

old (II Trial Tr. II, 1396). Petitioner entered the house through a side window (II Trial Tr. VII, 1389, 1391; State's Exhibit 229). Mrs. Hoster was awakened by Petitioner's entry. She grabbed a gun and went downstairs where she encountered Petitioner. Petitioner attacked her, disarmed her, and made her take her nightgown off. After asking her about the location of her purse, he put the gun to her head and led her upstairs to her bedroom. After going through her purse (and taking the money from it), he raped her. When he finished, he made Mrs. Hoster lead him out the back door (II Trial Tr. VII, 1383-85, 1392-95; II Trial Tr. VIII, 1449). The electricity to Mrs. Hoster's home had been shut off at the outside breaker box. An outside wire was cut as well (II Trial Tr. VII, 1389-90, 1395-96). Mrs. Hoster had bruises on her arms and on the inside of her legs, her eyes were bruised and swollen, her cheeks were swollen, and her right arm was broken (II Trial Tr. VII, 1397; II Trial Tr. VIII, 1449).

The rapes and murders of Mrs. Fowler and Mrs. Cutler occurred prior to the rapes of Mrs. Marshall and Mrs. Hoster. Mrs. Fowler was 83 years old (II Trial Tr. V, 853). She lived at 1200 Northwest 31st Street in Oklahoma City (II Trial Tr. III, 472). Her home was on the corner on the south side of the street (II Trial Tr. VII, 1434; State's Exhibit 206). Mrs. Fowler was found dead on her bed by her grandson on the morning on September 3, 1986 (II Trial Tr. III, 524-26, 549). When Mrs. Fowler spoke to her children just prior to the evening news the night before, she was fine (II Trial Tr. III, 492, 499-500). Entry to Mrs. Fowler's home was made through the back screen door (II Trial Tr. III, 522, 526, 592-

93; State's Exhibits 29 and 30). From review of the scene, it was determined that Mrs. Fowler was in the kitchen when Petitioner entered her home (II Trial Tr. III, 522-23, 526-27; II Trial Tr. 12/13/01, 27-28). Mrs. Fowler was raped (II Trial Tr. V, 857). A knotted cloth had been used to bind her hands. She had multiple rib fractures and bruising on her wrists, hands, eyes, lips, and cheeks. She also had a small cut to her throat (II Trial Tr. III, 616, 618, 621, 622-23, 627, 667-68; II Trial Tr. V, 857; State's Exhibits 32 through 36, 39, 40, and 187). She died from asphyxiation (II Trial Tr. V, 870).

Mrs. Cutler was 90 years old (II Trial Tr. V, 870). She lived across the street from Mrs. Fowler. Her home was also on the corner on the south side of the street (II Trial Tr. IV, 701; State's Exhibit 137). Mrs. Cutler was found dead on her bed by police on January 11, 1987 (II Trial Tr. IV, 703-06, 728-31). Entry to Mrs. Cutler's home was made through the back screen door (II Trial Tr. IV, 704, 729-30, 734-38, 739-40, 743-44, 749-50; State's Exhibits 63 through 66, 68 through 70, and 75). The electricity to Mrs. Cutler's home had been shut off at the breaker box. An outside wire was cut as well (II Trial Tr. IV, 729, 732, 751, 753-54, 760; State's Exhibits 53 and 67). Mrs. Cutler was raped. She had vaginal tears and anal bruising (II Trial Tr. V, 871-72, 876-78). A knotted pillowcase had been used to bind her hands. She had multiple rib fractures, a broken wrist, and bruising on her wrists, hands, arms, eyes, lips, and cheeks (II Trial Tr. IV, 757-58; II Trial Tr. V, 848, 871-72; II Trial Tr. 12/13/01, 33; State's Exhibits 77, 78 and 81). She died from asphyxiation (II Trial Tr. V, 879).

Finding "a substantial degree of similarity between the Marshall/Hoster assaults and the Fowler/Cutler homicides[,]" the OCCA found no error in the admission of Marshall/Hoster evidence. Lott, 98 P.3d at 335. The OCCA detailed the similarities as follows:

[A]ll four victims were white females over the age of 71 who lived alone; all four victims lived on the south side of the street and on corner lots; the back porch screen door was cut on the homes of three of the victims; the breaker box for the electricity to the residence was shut off in the homes of three of the four victims; entry to the residence was gained through a rear door in all four homes; a back door window was broken in three of the homes; two of the victims were awake when their homes was broken into and they were forced to their bedrooms; all four victims were raped vaginally while in their bedrooms; two of the four victims were also anally raped; all four victims were raped either late at night or in the early morning; all four victims were beaten about the head, face and arms; all four victims suffered vaginal tears and bleeding; a knotted rag was found on the beds of three of the victims; a pillow was placed over the faces of three of the victims during the assault; none of the residences occupied by the four victims were ransacked and nothing of any significant value was taken from any of the homes; all four assaults occurred within an eight month time period with the Fowler/Cutler crimes occurring four months apart and the Marshall/Hoster crimes occurring two months apart; all four victims lived within three miles of each other; [Petitioner] lived with his mother or sister near the Fowler/Cutler homes at the time of their murders and he lived with his brother near the Marshall/Hoster homes at the time of their assaults.

Id. The OCCA concluded that these "similarities show a visible connection sufficient to characterize a common scheme and to be probative on the issue of identity of the perpetrator." Id. The OCCA noted the greater latitude applied to the admission of other crimes in sexual assault cases, and in addition to finding that the evidence was properly

admitted, it found that the probative value of the evidence outweighed its prejudicial impact. Id. at 335-36.

Given the deference afforded the OCCA's merits decision, the Court cannot find that its decision is contrary to or an unreasonable application of Supreme Court law. In addition to the reasoning set forth by the OCCA, the Court notes that the jury was instructed on its consideration of the other crimes evidence. The jury was told that the evidence could not be considered as proof of Petitioner's guilt for the charged offenses, but only "on the issue of [his] alleged common scheme or plan and/or identity" (O.R. VII, 1220). Moreover, given the strength of the DNA evidence supporting Petitioner's guilt, the admission of the Marshall/Hoster evidence did not result in the denial of a fundamentally fair trial. The other crimes evidence made an already strong case stronger, but its admission did not unduly prejudice him. Accordingly, Petitioner's Ground Three does not merit his requested relief.

**D.      Ground Four:      Jury Instruction on Aiding and Abetting and Trial Counsel's Concession of Guilt.**

In his Ground Four, Petitioner asserts that error occurred when the jury was instructed on aiding and abetting. Petitioner contends, as he did on direct appeal, that the instructions were improper because he was not charged with this theory of criminal liability and lacked notice thereof. In light of the instructions given, Petitioner additionally asserts that his trial counsel was ineffective for conceding his guilt to the alternative felony murder charges. Petitioner asserts that his counsel should not have done so without first obtaining his

consent.[32] The OCCA denied Petitioner relief on these claims. Lott, 98 P.3d at 336-38.

Respondent argues that Petitioner is not entitled to relief because the OCCA's decision is not

contrary to or an unreasonable application of Supreme Court law.

To obtain relief for an instructional error, a habeas petitioner must meet a heavy

burden. "The burden of demonstrating that an erroneous instruction was so prejudicial that

it will support a collateral attack on the constitutional validity of a state court's judgment is

even greater than the showing required to establish plain error on direct appeal."

Henderson v. Kibbe, 431 U.S. 145, 154 (1977). When no objection was made at trial, as in

the present case, relief will be warranted in only the rarest situations. Id. It is not enough to

show that the instruction was "undesirable, erroneous, or even 'universally condemned. . . .'"

Cupp v. Naughten, 414 U.S. 141, 146 (1973). The standard is "whether the ailing instruction

by itself so infected the entire trial that the resulting conviction violates due process." Id.

at 147. Since the OCCA addressed this claim on the merits, this standard must be applied

through AEDPA deference.

---

[32] Within his Ground Four, Petitioner makes an additional argument that the aiding and abetting instructions "should not have been given without the full instructions required by Tison [v. Arizona, 481 U.S. 137 (1987)]." Petition, pp. 66-67. Respondent contends, and Petitioner does not deny, that this claim is unexhausted. The Court finds that this claim is procedurally barred. See Anderson v. Sirmons, 476 F.3d 1131, 1139 n.7 (10th Cir. 2007) ("'Anticipatory procedural bar' occurs when the federal courts apply procedural bar to an unexhausted claim that would be procedurally barred under state law if the petitioner returned to state court to exhaust it."). See also Article IV.K., infra (addressing Petitioner's argument against the application of a procedural bar to any of his claims).

Reviewing Petitioner's claim for plain error, the OCCA found that Petitioner had ample notice of the State's theory of criminal liability. "The State's theory throughout proceedings was that [Petitioner] committed the rapes, and that [Petitioner] either killed the victims himself or he aided and abetted Miller in killing the victims." Lott, 98 P.3d at 336. The OCCA additionally found that aiding and abetting instructions were warranted by the evidence.

> The State's evidence included the results of DNA testing showing [Petitioner] was the donor of the semen found at the crime scenes, and that Miller had been excluded as the semen donor. The State also presented evidence showing [Petitioner] had pled guilty to committing two other rapes under very similar circumstances as the charges on trial. During the cross-examination of several of the State's witnesses, the defense established that Miller had made certain statements about the Fowler/Cutler crimes which were not known to the general public, and that based in part upon those statements, Miller had been previously convicted of committing the Fowler/Cutler homicides. During re-direct examinations, the State elicited testimony that it was possible there were two intruders into the homes of Mrs. Fowler and Mrs. Cutler and that it was possible that one intruder killed the victims while the other watched. Additionally, during its case-in-chief, the defense introduced evidence concerning Miller's prior prosecution in the Fowler/Cutler cases.

Id. at 336-37. Having conducted a thorough review of the state court record, the Court finds the OCCA's conclusions are not unreasonable. Given certain statements made by Mr. Miller regarding the Fowler/Cutler crimes, statements which were not admitted at Petitioner's trial but were continually referred to, Mr. Miller could have been present when the murders occurred. While no physical evidence linked Mr. Miller to the crimes, the evidence which supported the possibility of his presence, along with Petitioner's insinuation that Mr. Miller may have been the one who smothered the victims after Petitioner raped them, inextricably

intertwined the issue of criminal liability as an aider and abettor. Petitioner was on notice of this theory of liability which was, as the OCCA found, supported by the evidence.

In light of the aiding and abetting instructions, Petitioner additionally complains that he was denied the effective assistance of counsel when one of his four attorneys admitted in closing argument that Petitioner committed the rapes against Mrs. Fowler and Mrs. Cutler. Petitioner takes issue with the following statement: "I don't know what you're going to do with that DNA, but at worst they have proven that [Petitioner] was the rapist which we told you a long time ago. At worst." (II Trial Tr. IX, 1641). Petitioner contends that his counsel should not have made this concession, but "should have objected to the Court's instructions, explained to the Court their theory of the case, gotten [his] approval on the record before proceeding with the inculpatory theory, or changed its [sic] theory to simply challenging the State's evidence." Petition, p. 74. According to Petitioner, failure to take these steps constituted ineffective assistance.

Claims of ineffective assistance of counsel are governed by Strickland v. Washington, 466 U.S. 668 (1984). To obtain relief under Strickland, a petitioner must show that his counsel's performance was deficient and that he was prejudiced by it. Strickland, 466 U.S. at 687. The assessment of counsel's conduct is "highly deferential," and a petitioner must overcome the strong presumption that counsel's actions constituted sound trial strategy. Id. at 689. "There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." Id.

47

In denying Petitioner relief on this claim, the OCCA applied Strickland. Lott, 98 P.3d at 337.

The question is whether it did so unreasonably.

The OCCA found that Petitioner's counsel did not concede his guilt, and that "[a]ny

perceived conciliatory aspect of the remark was not prejudicial to [him]." Id. at 337, 338.

The OCCA detailed counsel's actions as follows:

> The defense was well aware from early on that the State had DNA evidence which conclusively placed [Petitioner] at the scene. The defense filed numerous pre-trial motions challenging that evidence. To counter the State's evidence at trial, the defense showed that the scientific evidence relied upon 14 years ago to convict Robert Miller of the Fowler/Cutler crimes-hair and blood analysis-had since been proven unreliable. Defense counsel questioned whether DNA analysis might not also go the way of hair and blood analysis in light of future advances in forensic testing. Counsel also argued that all the State had to prove [Petitioner's] guilt was DNA and that relying on DNA was like gambling and relying on mere probabilities. Defense counsel urged the jury not to let the State's experts decide the case for them. The defense also presented evidence showing Miller's involvement in the Fowler/Cutler crimes and his knowledge of details that only someone present at the crime scenes would have known. Defense counsel argued in closing argument that the evidence showed Miller wasn't a mere observer to the crimes, but the actual perpetrator of the crimes.
>
> Defense counsel also challenged the State's alternative theories of guilt and argued the State could not assert that Miller was and was not the killer. Defense counsel argued that while Miller was in jail for the Fowler/Cutler crimes, other rape victims did not die. Defense counsel stated that when the State told the jury they had no evidence Miller was the killer, "that cuts both ways because they also have no evidence what Ronald Lott was. None." Counsel then stated, "I don't know what you're going to do with that DNA, but at worst they have proven that Ronald Lott was the rapist ..." Defense counsel further argued that merely because Miller was not included as a donor of the semen found at the scene, that did not mean that he was not a rapist and a killer. Counsel argued it merely showed Miller did not ejaculate at the scene. Counsel concluded his closing argument by asserting the State had not proven

that Miller was not the killer, and because of that reasonable doubt as to [Petitioner's] guilt existed.

Id. at 337-38.  The OCCA then concluded:

> Claiming that [Petitioner] had not been involved at all would have completely destroyed counsel's credibility before the jury in light of the strong evidence of guilt.  From the record, it appears that minimizing [Petitioner's] role in the crimes in light of the DNA evidence was the best possible method to gain an acquittal on the charges.  Accordingly, we do not find counsel's performance deficient under the circumstances.

Id. at 338 (citation omitted).

Although the OCCA found that counsel had not conceded guilt, the Supreme Court

has acknowledged that conceding guilt in the first stage of a capital proceeding may be a

reasonable trial strategy.

> Although such a concession in a run-of-the-mine trial might present a closer question, the gravity of the potential sentence in a capital trial and the proceeding's two-phase structure vitally affect counsel's strategic calculus. Attorneys representing capital defendants face daunting challenges in developing trial strategies, not least because the defendant's guilt is often clear. Prosecutors are more likely to seek the death penalty, and to refuse to accept a plea to a life sentence, when the evidence is overwhelming and the crime heinous. In such cases, "avoiding execution [may be] the best and only realistic result possible."

> Counsel therefore may reasonably decide to focus on the trial's penalty phase, at which time counsel's mission is to persuade the trier that his client's life should be spared. Unable to negotiate a guilty plea in exchange for a life sentence, defense counsel must strive at the guilt phase to avoid a counterproductive course.  In this light, counsel cannot be deemed ineffective

for attempting to impress the jury with his candor and his unwillingness to engage in "a useless charade."

Florida v. Nixon, 543 U.S. 175, 190-92 (2004) (citations omitted) (footnote omitted). In light of the overwhelming DNA evidence, a case characterized by the trial court as "the most simple felony murder case in the history of felony murder," counsel openly acknowledged that but for the Bill of Particulars, Petitioner would have pled guilty (Tr. 11/6/00, 61; Tr. 3/22/01, 107-08). So because of the Bill, Petitioner proceeded to trial. At trial, and in the ways detailed by the OCCA, Petitioner's counsel advocated as best they could in light of the given evidence. Given Miller's involvement, counsel argued that reasonable doubt existed, but counsel also planted the seed of lessened accountability for the jury's second stage determination (II Trial Tr. X, 1822). Under these circumstances, the OCCA's determination that Petitioner's counsel did not render deficient performance is not unreasonable.

In conclusion, Petitioner's Ground Four does not merit relief. Petitioner has not shown that the OCCA's decision regarding the aiding and abetting instructions and his counsel's actions with respect thereto is contrary to or an unreasonable application of clearly established Supreme Court law. Ground Four is denied.

### E.     Ground Five:      Character Evidence and Hearsay.

In his Ground Five, Petitioner asserts that his due process rights were violated by the testimony of two first stage witnesses, Carol Sue Disney and Mary Akins. Petitioner contends that through their testimony the jury heard irrelevant and prejudicial character

evidence regarding Mrs. Cutler. Petitioner additionally asserts that their testimony regarding statements made by Mrs. Cutler constituted impermissible hearsay. Petitioner raised this claim on direct appeal. The OCCA found that most of the testimony was relevant and properly admitted. As to the portions of their testimony that should not have been admitted, the OCCA found the errors to be harmless beyond a reasonable doubt. Lott, 98 P.3d at 340-41. Respondent contends that Petitioner has not shown that the OCCA's decision is contrary to or an unreasonable application of Supreme Court law.

"Federal habeas review is not available to correct state law evidentiary errors. . . ." Smallwood v. Gibson, 191 F.3d 1257, 1275 (10th Cir. 1999). See also Thornburg v. Mullin, 422 F.3d 1113, 1128-29 (10th Cir. 2005) (quoting Smallwood); Spears v. Mullin, 343 F.3d 1215, 1225-26 (10th Cir. 2003) (same). "Absent a showing that the admission of the evidence violated a specific constitutional guarantee, a federal court on habeas review will not disturb the state court's evidentiary ruling unless it was 'so grossly prejudicial that it fatally infected the trial and denied the fundamental fairness that is the essence of due process.'" Wilson v. Sirmons, 536 F.3d 1064, 1101 (10th Cir. 2008) (quoting Fox v. Ward, 200 F.3d 1286, 1296 (10th Cir. 2000)).

The testimony at issue was summarized by the OCCA follows:

> Mrs. Cutler had no living immediate family at the time of [Petitioner's] trial; therefore the State presented the testimony of Carol Sue Disney, a long time friend. Mrs. Disney testified that Mrs. Cutler had taken care of Mrs. Disney's mother when she was an infant, and that Mrs. Disney had frequented Mrs. Cutler's home while she was growing up. Mrs. Disney said that in later years she still visited Mrs. Cutler and did errands for her.

Mrs. Disney testified that Mrs. Cutler lived alone, did not drive, and rarely left her home. She said Mrs. Cutler moved very slowly and had a cane she would use to help her walk by the end of the day. Mrs. Disney testified that Mrs. Cutler had a set daily routine, and went to bed soon after it got dark. She said Mrs. Cutler would leave a bathroom light on when she went to bed. She said Mrs. Cutler was very cautious when people came to her door and would not open the door more than a crack if it was a stranger. Mrs. Disney explained that at night Mrs. Cutler would not answer the door at all. Mrs. Disney testified that after Mrs. Fowler's murder, Mrs. Cutler told her she was afraid, and that she knew she was going to be next.

The State also introduced the testimony of Mary Akins, a postal service employee who delivered mail to Mrs. Cutler. Ms. Akins testified she checked on Mrs. Cutler as part of a "carrier alert program" in which the letter carriers check on elderly, handicapped or invalid people on their route. Ms. Akins testified that she would visit with Mrs. Cutler for a few minutes every day and then occasionally stop and have lunch with her. Ms. Akins stated that Mrs. Cutler told her she had been friends with Mrs. Fowler, and that after Mrs. Fowler's murder, Mrs. Cutler was concerned that she would be next.

Lott, 98 P.3d at 340.

Because no objection to the testimony was made, the OCCA reviewed this claim for plain error.  Id.  The OCCA found that most of the testimony was relevant. First, the testimony was relevant to show the similarities between the Fowler/Cutler crimes.

In support of the joinder of the charges in a single trial, the State argued the similarities of the two crimes showed a common scheme or plan by [Petitioner] to rape and murder elderly women who lived alone. In Mrs. Fowler's case, family members testified that she was elderly and lived alone. In Mrs. Cutler's case, the testimony of Mrs. Disney and Ms. Akins provided that evidence which tended to show the circumstances of Mrs. Cutler's murder were so similar to those of Mrs. Fowler as to warrant combining the two offenses for one trial.

Id.  Second, the testimony was relevant to Petitioner's guilt.

Mrs. Disney's testimony concerning Mrs. Cutler's personal routines, when combined with physical evidence recovered from the scene of the murder, was probative in establishing that Mrs. Cutler's home had been forcefully entered, more than likely during the late night hours or early morning hours while she was asleep, and that she was physically incapable of fighting back against her assailant. The evidence was probative in showing that [Petitioner] preyed on defenseless women who could not put up much resistance to him.

Id.

The OCCA did, however, find error in two aspects of their testimony. First, through Mrs. Disney, Mrs. Cutler was described to the jury as a sweet, hospitable person. The OCCA found no relevance to this testimony. However, given the minimal prejudice flowing therefrom, the OCCA concluded that its admission was harmless beyond a reasonable doubt. Id. at 340-41. Second, the OCCA found error in the testimony from both witnesses regarding Mrs. Cutler's statements that she would be Petitioner's next victim. Again, the OCCA found the error harmless. Id. at 341 ("[T]his error is harmless as we find beyond a reasonable doubt that the error did not contribute to the verdict or sentence.").

The Court finds that the OCCA's determination of this claim is reasonable. As the OCCA found, most of the testimony was relevant as to Mrs. Cutler's lifestyle, routine, and physical abilities. That which was not relevant was harmless. Given the lack of objection, the limited testimony, the overwhelming evidence of guilt, and the evidence in aggravation, the errors did not have a "'substantial and injurious effect or influence in determining the jury's verdict.'" Brecht v. Abrahamson, 507 U.S. 619, 631 (1993) (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)). See Fry v. Pliler, 551 U.S. 112, 121-22 (2007) (the

Brecht standard applies to Section 2254 cases regardless of whether the state court recognized the error and reviewed it under Chapman v. California, 386 U.S. 18 (1967)). Accordingly, relief is denied as to Petitioner's Ground Five.

**F.    Ground Six:          Mistrial.**

In his Ground Six, Petitioner contends that in order to obtain a mistrial in his first trial, he had to sacrifice one constitutional right for another, namely, the right to present a defense for the right to have the State prove its case beyond a reasonable doubt. Petitioner asserts, as he did on direct appeal, that Simmons v. United States, 390 U.S. 377 (1968), entitles him to relief. Respondent argues that the OCCA's denial of Petitioner's claim is not contrary to or an unreasonable application of Simmons.

As previously noted, Petitioner's first trial was interrupted when the parties first learned that the medical examiner had retained vaginal slides from the autopsies of both victims. The trial court recessed the jury for a week and the slides were tested. Although the testing of Mrs. Cutler's slide was inconclusive, the testing of Mrs. Fowler's slide implicated Petitioner. Because Petitioner's defense included an attack on the validity of the DNA evidence due to Ms. Gilchrist's handling of the evidence, this new evidence foreclosed that continued argument, at least as it related to Mrs. Fowler (I Trial Tr. III, 476-85). In light of the new evidence, the defense argued first for dismissal of the charges, then suppression of the evidence, and finally a mistrial. These motions were denied; however, the trial court did

offer a continuance to afford the defense time to address the new evidence. The defense refused the offer (I Trial Tr. VI, 1044-45, 1052-53, 1073-76).

On the day the trial was set to resume, the defense continued to present arguments for the granting of a mistrial (I Trial Tr. VI, 1087, 1093-95, 1108-09). In the midst of this argument, the parties reached an agreement. The State would not object to the granting of a mistrial if the defense would agree to stipulate to the testimony of the witnesses within the DNA chain of custody. The stipulation would not entail a concession by the defense that the testimony was fact. The defense retained the right to challenge the evidence and call the witnesses themselves if needed to present issues of contamination. A mistrial was granted (I Trial Tr. VI, 1117-22).

The OCCA found no merit to Petitioner's claim that he was forced to surrender one constitutional right for another.

> There is nothing in the record that indicates the granting of the mistrial was based upon the defense's agreement to the State's conditions. The record reflects defense counsel sought a mistrial because he did not want to change the theory of defense mid-trial. A strategic agreement was reached between counsel concerning presentation of the evidence in the event of a new trial. The trial court did not mandate the stipulation, but merely approved the agreement reached between counsel. Further, the record shows [Petitioner] did not give up any right to present a defense as the defense retained the right to call any witness they chose, despite the stipulation.

Lott, 98 P.3d at 342. Under these circumstances, the OCCA found that Petitioner, unlike Simmons, was not forced to choose between constitutional rights and therefore was not entitled to relief. Id.

The record supports the OCCA's findings. A trial court has broad discretion in determining whether or not to grant a mistrial. Renico v. Lett, ___ U.S. ___, 130 S.Ct. 1855, 1863 (2010); Walck v. Edmondson, 472 F.3d 1227, 1236 (10th Cir. 2007). From the record, it is apparent that the trial court believed that a mistrial was unwarranted and that the issues which arose from the discovery of the new evidence could be effectively handled through a continuance and/or a proper instruction to the jury. Unsatisfied with the trial court's determination, Petitioner pursued the State's acquiescence to his mistrial motion in hopes of persuading the trial court to find otherwise. It worked. In addition, Petitioner was not required to give up his right to have the State prove its case beyond a reasonable doubt. Petitioner's agreement with the State did not reduce the State's burden of proof, only its financial responsibility to produce numerous chain of custody witnesses for testimony. Petitioner retained the right to challenge this evidence and present any witness needed to do so. Under these circumstances, the Court cannot find that OCCA unreasonably denied Petitioner relief. The OCCA's decision is not contrary to or an unreasonable application of Simmons. Accordingly, Petitioner's Ground Six is denied.

G.    **Ground Seven:    Expert Opinion That Mrs. Cutler Was Orally Sodomized.**

In his Ground Seven, Petitioner asserts that error occurred when Dr. Janet Rodgers was permitted to offer her opinion that Mrs. Cutler had been orally sodomized. Petitioner contends that her testimony invaded the province of the jury, violated the principles of Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), and significantly

prejudiced him in the second stage. The OCCA addressed the merits of this claim on direct appeal and denied relief. Lott, 98 P.3d at 342-43. Respondent asserts that Petitioner is not entitled to relief because he has not shown that the OCCA's decision is contrary to or an unreasonable application of Supreme Court law.

Respondent is correct that Daubert provides Petitioner no relief. Daubert concerns the admission of expert testimony in a federal trial. It is inapplicable in the review of a state prisoner's habeas petition. The standard which governs Petitioner's Ground Seven is the general rule of fundamental fairness. See Wilson, 536 F.3d at 1101-02 ("Because Daubert does not set any specific constitutional floor on the admissibility of scientific evidence, the only relevant question is whether the [admitted evidence] rendered the trial fundamentally unfair."); Williamson v. Ward, 110 F.3d 1508, 1522-23 (10th Cir. 1997) (noting that the district court erred in applying Daubert, instead of the due process/fundamental fairness standard, to the issue of whether hair evidence was properly admitted). Thus, relief will be warranted only upon a finding that "the state court's evidentiary ruling . . . was 'so grossly prejudicial that it fatally infected the trial and denied the fundamental fairness that is the essence of due process.'" Wilson, 536 F.3d at 1101 (citation omitted). In applying this analysis, "a federal court must 'tread gingerly' and exercise 'considerable self-restraint.'" Duckett v. Mullin, 306 F.3d 982, 999 (10th Cir. 2002) (quoting United States v. Rivera, 900 F.2d 1462, 1477 (10th Cir. 1990)).

Dr. Rodgers testified as a sexual assault expert. At the time of trial, Dr. Rodgers was a practicing family physician with twenty-five years experience in emergency medicine. In the course of her career, she had personally performed and/or supervised 1,000 rape exams (II Trial Tr. VIII, 1541-43). Dr. Rodgers reviewed the crime scene photos, autopsy photos, and autopsy reports for both victims (II Trial Tr. VIII, 1553). From her review of this evidence, Dr. Rodgers opined that Mrs. Cutler had been raped vaginally, anally, and orally (II Trial Tr. VIII, 1554-55).

Regarding the oral sodomy, Dr. Rodgers testified that the bruises on Mrs. Cutler's mouth were the first indication that oral sodomy had occurred. The bruising indicated that force had been used. Dr. Rodgers later learned that the pillow under Mrs. Cutler's head contained semen and Mrs. Cutler's secretions. With that information and the "bite mark" on the pillow, it all "fit[] together" that oral sodomy occurred (II Trial Tr. VIII, 1555-56, 1562-63; State's Exhibit 81). Mrs. Cutler's multiple rib fractures and the bruising on her wrists were also consistent with the rapist sitting on top of her and holding down her hands as he orally sodomized her (II Trial Tr. VIII, 1563-64). Finally, given the vaginal secretions on the pillow, Dr. Rodgers concluded that the pillow was used by the rapist for positioning, and that after placing the pillow under her bottom for the vaginal rape, the rapist placed the pillow under Mrs. Cutler's head for the oral sodomy (II Trial Tr. VIII, 1564-67; State's Exhibit 192). Dr. Rodgers testified that her opinion that Mrs. Cutler had been orally sodomized was unaffected by the absence of semen in Mrs. Cutler's mouth. She explained

that the absence of semen on an oral swab could be the result of an ineffective swabbing technique, lack of ejaculation, or excessive salivation (II Trial Tr. VIII, 1549-52).

The OCCA found that Dr. Rodgers' testimony was proper opinion testimony. Because Dr. Rodgers did not tell the jury what result to reach on an ultimate issue, her testimony was not improper.

> Dr. Rodgers' testimony was based upon her examination of materials from the investigation into the rape/homicide coupled with her specialized training. At no time did Dr. Rodgers say that [Petitioner] had raped or killed Mrs. Cutler; rather, she testified Mrs. Cutler's injuries were consistent with forcible rape based upon her specialized knowledge of sexual assaults. As this was proper opinion testimony, no error occurred in its admission.

Lott, 98 P.3d at 343. The Court finds nothing unreasonable with this determination. Dr. Rodgers was amply qualified to render an opinion as to whether or not Mrs. Cutler had been orally sodomized. Dr. Rodgers not only told the jury her expert conclusion, but explained her findings based on the evidence. Contrary to Petitioner's assertion, Dr. Rodgers' opinion was not based solely on the bloody "mouth print" on the pillow. As detailed above, Dr. Rodgers also considered the bruising on Mrs. Cutler's mouth and wrists, her broken ribs, the stains on the pillow, and the location of the pillow.

In her testimony, Dr. Rodgers referred to the "mouth print" on the pillow as being "in the shape of her mouth" and a "bite mark" (II Trial Tr. VIII, 1555, 1563). Although Petitioner questions her expertise to make this determination, it was but a common sense observation, which had been noted by other witnesses in earlier testimony (II Trial Tr. IV,

763, 766; II Trial Tr. V, 819).[33] In addition, photographs of the pillow were admitted into evidence (State's Exhibits 81 and 193). Thus, as the OCCA found, the jury was able to make its own assessment about the pattern.[34] Lott, 98 P.3d at 343.

Because the OCCA found no error in the admission of the evidence in the first stage, it found no error in the second stage as well. But see Cargle v. Mullin, 317 F.3d 1196, 1208 (10th Cir. 2003) (acknowledging that guilt stage error can have "a continuing, cognizable effect" on the penalty stage). The OCCA reasoned as follows:

> Dr. Rodgers' testimony was proper expert opinion. Further, the oral sodomy was part of the *res gestae* of the offense. Contrary to [Petitioner's] argument, it is not the type of aggravating evidence that results in the arbitrary and capricious imposition of the death penalty that the Eighth Amendment forbids. See Payne v. Tennessee, 501 U.S. 808, 831, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991). In light of the aggravating evidence, evidence of the oral sodomy did not determine the sentence.

Lott, 98 P.3d at 343. Again, this determination is reasonable.

Because Dr. Rodgers' testimony was properly admitted, Petitioner's due process rights were unabridged by its admission. Accordingly, Petitioner's Ground Seven is denied.

---

[33] These witnesses described the pattern as a "circular smear," "transfer of blood from the mouth," "impression of a mouth," and "O part." As the OCCA noted, one of the witnesses also testified that he saw blood on Mrs. Cutler's mouth (II Trial Tr. V, 812). Lott, 98 P.3d at 343.

[34] The jury was instructed not to surrender its own judgment for that of any expert, but to evaluate his or her testimony and give it such weight and value as it deemed appropriate (O.R. VII, 1221).

**H.     Ground Eight:      First Stage Jury Instructions.**

In his Ground Eight, Petitioner asserts that he was denied a fair trial based upon the omission of three standard jury instructions.  Petitioner raised this claim on direct appeal.  The OCCA denied relief.  <u>Lott</u>, 98 P.3d at 338-39.  Respondent asserts that Petitioner is not entitled to relief because he has not shown that the OCCA's decision is contrary to or an unreasonable application of Supreme Court law.  The Court agrees.

"A habeas petitioner who seeks to overturn his conviction based on a claim of error in the jury instructions faces a significant burden."  <u>Ellis v. Hargett</u>, 302 F.3d 1182, 1186 (10th Cir. 2002).  <u>See</u> Article IV.D., <u>supra</u> (setting forth the standard of review).  Where, as here, no objection was made at trial, relief will be warranted in only the rarest situations.  <u>Henderson</u>, 431 U.S. at 154.  In addition, "[a]n omission . . . is less likely to be prejudicial than a misstatement of the law."  <u>Id.</u> at 155.  "The significance of the omission . . . may be evaluated by comparison with the instructions that were given."  <u>Id.</u> at 156.

Addressing each omitted instruction in turn, the OCCA concluded that none of them affected the jury's consideration of Petitioner's guilt because the instructions as given adequately stated the applicable law.  The first omitted instruction, OUJI-CR (2d) 9-14, would have told the jury that Petitioner could not be convicted of murder "unless both the fact of the death of the person allegedly killed and the fact that [her] death was caused by the conduct of another person are established as independent facts and beyond a reasonable

doubt."   The OCCA found that this particular instruction was not required in Petitioner's case because it did not involve an extrajudicial confession.   Lott, 98 P.3d 338.   See Fontenot v. State, 881 P.2d 69, 80 n.15 (Okla. Crim. App. 1994) (holding that the instruction is to be given "in all cases in which a defendant's extrajudicial confession has been properly admitted").  In addition, the substance of OUJI-CR (2d) 9-14 was encompassed by the basic instruction on the elements of the offense (O.R. VII, 1208).

> This instruction and [Petitioner's] requested instruction both inform the jury the State must prove beyond a reasonable doubt the death of a human and that the defendant caused that death. Therefore, as the instruction given to the jury addresses the same principle of law as that included in the omitted instruction, we find no prejudice as a result of the omitted instruction.

Lott, 98 P.3d at 339.   For the reasons espoused by the OCCA, the Court finds that Petitioner's due process rights were not infringed by the omission of OUJI-CR (2d) 9-14.

The second omitted instruction, OUJI-CR (2d) 4-65, would have defined the term "in the commission of" as used in the instruction outlining the elements of felony murder.  While this instruction should have been given, the OCCA found that its absence was not fatal. The Court agrees.  The term "in commission of" was used in the elements instruction as follows:

> Second, the death occurred as a result of an act or event which happened *in the commission of* a forcible rape and a First Degree Burglary

> Third, caused by the defendant or any person engaged with the defendant while *in the commission of* a forcible rape and a First Degree Burglary

> Fourth, the elements of forcible rape and First Degree Burglary the defendant is alleged to have been *in the commission of* are as follows . . .

(O.R. VII, 1211) (emphasis added). The use of the term in this instruction is straightforward and easily understood. No further definition was required to protect Petitioner's due process rights.

The final omitted instruction about which Petitioner complains is the instruction defining sexual intercourse, OUJI-CR (2d) 4-122. This instruction would have defined the term as "the actual penetration of the vagina/anus by the penis." Lott, 98 P.3d at 339. Again, the OCCA found that the absence of this instruction did not result in error. The OCCA's analysis was two-fold. First, the elements of first degree rape were properly delineated for the jury. The jury was advised that rape was (1) sexual intercourse; (2) with a person who was not the spouse of the defendant; and (3) where force or violence was used against the victim (O.R. VII, 1211-12). The OCCA found that no further explanation of the term was needed. Second, given that Petitioner's semen was found inside the vaginal vault of each victim, penetration was clearly proven. Lott, 98 P.3d at 339. The Court finds no fault with this analysis. The absence of OUJI-CR (2d) 4-122 did not violate Petitioner's due process rights.

In summary, the Court concludes that the OCCA's determination of Petitioner's Ground Eight is not unreasonable. The jury instructions as given adequately stated the law and properly directed the jury in its consideration of Petitioner's guilt. No due process violation occurred, and therefore, Petitioner is not entitled to relief on his Ground Eight.

I.     **Ground Nine:     Expert Opinion Regarding Why Mrs. Fowler and Mrs. Cutler Were Killed.**

In his Ground Nine, Petitioner raises another claim of evidentiary error. Here, Petitioner asserts that Oklahoma City Police Inspector Gerald McKenna gave improper expert opinion testimony. Petitioner contends that Inspector McKenna's testimony on redirect examination that Mrs. Fowler and Mrs. Cutler were killed for the purpose of eliminating witnesses was a non-scientific conclusion, invaded the province of the jury, and was more prejudicial and probative. Petitioner presented this claim to the OCCA on direct appeal. The OCCA denied relief. Lott, 98 P.3d 343-45. Respondent asserts that Petitioner has failed to show how this determination by the OCCA violated his constitutional rights, including his right to a fundamentally fair trial.

As previously noted, the standard of review for this evidentiary claim is the general rule of fundamental fairness. Therefore, the question is whether Inspector McKenna's testimony was so prejudicial that it denied Petitioner a fundamentally fair trial. See Article IV.G., supra. This assessment is made by reviewing the entire proceedings and taking into consideration all of the admitted evidence, the instructions to the jury, and whether the complained of evidence was objected to at trial. See Le v. Mullin, 311 F.3d 1002, 1013 (10th Cir. 2002) (discussing the fundamental fairness standard in the context of prosecutorial misconduct claim).

Inspector McKenna, who was one of the investigators assigned to the Marshall/Hoster cases, was called by the State to discuss an obvious difference between the Marshall/Hoster

rapes and the Fowler/Cutler homicides (II Trial Tr. VII, 1410-11). As the question was posed by the prosecutor on direct examination, "[a]ssuming that [Petitioner] is the perpetrator of the rapes and the murders of Ms. Fowler and Ms. Cutler, why then wouldn't he have also killed the women he admitted to raping, Ms. Marshall and Ms. Hoster?" (II Trial Tr. VII, 1413). Inspector McKenna testified that it was his opinion that Petitioner did not kill his later two rape victims in order to prevent police from connecting him to his earlier similar crimes. Because Mr. Miller was in jail for the Fowler/Cutler homicides when Petitioner committed the Marshall/Hoster rapes, killing Mrs. Marshall and Mrs. Hoster would have brought attention to the matter and caused police to question whether they had apprehended the actual perpetrator of the Fowler/Cutler homicides (II Trial Tr. VII, 1413-14).

On cross-examination, defense counsel questioned Inspector McKenna about his belief that the four crimes were related and that Petitioner alone committed them all. Defense counsel also asked Inspector McKenna for his explanation as to why two victims were killed and two were not. Inspector McKenna restated the basis for his opinion (II Trial Tr. VIII, 1474-75). From there, defense counsel challenged Inspector McKenna's opinion based on statements Mr. Miller had made regarding the Fowler/Cutler homicides. Although Inspector McKenna did not believe that Mr. Miller was at the Fowler/Cutler crime scenes, he acknowledged that it was a possibility (II Trial Tr. VIII, 1484-85). Inspector McKenna also testified that this was the only case he had been involved in where the initial rape victims were killed and the others were not (II Trial Tr. VIII, 1487-88).

Following up this line of questioning, the prosecutor asked Inspector McKenna on redirect examination if he had "some information that [he] could share with the jury about what causes [a serial rapist] to choose whether or not to kill or whether [he is] driven to kill?" (II Trial Tr. VIII, 1490). Inspector McKenna then gave the testimony about which Petitioner complains. Inspector McKenna explained that there are two types of sexually related homicides. One is rape/murder and the other is a sexually motivated homicide. In a rape/murder, rape is the primary crime and the murder occurs for another reason. The most common reason for the murder is the elimination of a witness who would be able to identify the perpetrator. In a sexually motivated homicide, the homicide is the primary crime and the rape occurs secondarily for sexual gratification purposes. Inspector McKenna was then asked for his opinion as to which category the Folwer/Cutler homicides fell into. Inspector McKenna replied "rape/murder" for the "[e]limination of a witness." The defense made no objection to this line of questioning (II Trial Tr. VIII, 1490-92).

Because no objection was made at trial, the OCCA reviewed Petitioner's complaint regarding Inspector McKenna's testimony for plain error only. Lott, 98 P.3d 343. The OCCA found that Inspector McKenna was a qualified expert and that his testimony was proper opinion testimony. The OCCA reasoned as follows:

> In the present case, McKenna's education and training in the field of sex crime investigation demonstrated sufficient specialized knowledge to qualify him to testify as an expert on the subject. His testimony certainly assisted the jury in understanding why some of the rape victims were killed while others were left alive. We find no abuse of the trial court's discretion in qualifying McKenna as an expert.

Further, McKenna's testimony that the crimes in this case fit into the "rape/murder" category of sexually related homicides because of the apparent need for the elimination of witnesses was relevant evidence of the killer's intent. The testimony was well within the bounds of McKenna's specialized knowledge. The testimony did not invade the province of the jury or improperly touch on an ultimate issue in the case nor did it direct the jury to find the aggravating circumstance of "avoid arrest." Rather, the testimony was proper expert opinion testimony based upon McKenna's years of investigation and analysis of sexually related homicides.

Id. at 344 (citation omitted). The OCCA also found that the evidence was not "substantially more prejudicial than probative." Id. at 345.

McKenna's testimony was not the only evidence offered in support of the "avoid arrest" aggravator. Further, despite the guilty verdict returned against [Petitioner], the question of Robert Miller's involvement in the crimes was still an issue in the case and was addressed in the closing arguments of both the prosecution and the defense. And finally, the trial court instructed the jury that it was free to give the expert evidence whatever weight and credit it deemed proper. Accordingly, we find McKenna's expert opinion testimony was not determinative of the death sentence.

Id.

The OCCA's determination of Petitioner's Ground Nine is not unreasonable. Inspector McKenna's testimony was based on his extensive experience in sex crimes investigation and was relevant to the issues before the jury. Even before Inspector McKenna testified, the defense had highlighted this "major difference" between the homicides and the rapes (II Trial Tr. VII, 1378-79). The defense used this major difference to place the blame on Mr. Miller. "When Robert Miller is in jail, nobody dies. When he's sitting in the room, people die" (II Trial Tr. IX, 1644). In second stage, the jury was urged to considered the

Miller evidence in mitigation. "You might have questions about the involvement of Robert Miller and how that fits in" (II Trial Tr. X, 1822). Given the relevance of the evidence, and the lack of objection to it, there is no basis for finding that its admission caused Petitioner to receive a fundamentally unfair trial. Relief on Ground Nine is denied.

**J.    Ground Ten:        Victim Impact Evidence.**

In his Ground Ten, Petitioner complains about the admission of victim impact evidence. Petitioner's particular complaint concerns the testimony of Mrs. Fowler's granddaughter. Petitioner asserts that she should not have been allowed to testify because her testimony was irrelevant and cumulative given the parameters of Oklahoma's statute governing the admission of victim impact evidence. Respondent contends that Petitioner is not entitled to relief because Petitioner has not shown that the OCCA's adjudication of this claim is contrary to or an unreasonable application of Payne v. Tennessee, 501 U.S. 808 (1991).

When presented with this claim on direct appeal, the OCCA found that it had merit. Addressing the issue as a matter of first impression, the OCCA found that the trial court erred in allowing Mrs. Fowler's granddaughter to testify as a family designee. Because Mrs. Fowler's children testified, testimony by a designee was unnecessary and unauthorized. The OCCA also noted that a grandchild is not included in the statutory definition of immediate family permitted to give victim impact testimony. Lott, 98 P.3d at 347 & n.15.

Having found error, the OCCA then addressed whether relief was warranted. Citing

Payne, the OCCA found that relief was not warranted because the testimony did "nothing which 'improperly weighted the scales' at trial." Id. at 347. The OCCA noted that the testimony was brief and partially cumulative to the testimony of Mrs. Fowler's children. In addition, the witness did not focus on the emotional aspects of Mrs. Fowler's death, and the

jury was properly instructed as to its consideration of victim impact evidence.[35] Id. at 347-48. The OCCA concluded as follows:

> [Petitioner] had been convicted of raping and killing two elderly, defenseless women in their homes. Evidence of the aggravating circumstances was overwhelming and evidence of the aggravating circumstances clearly outweighs the mitigation evidence. Reviewing the entire record, we cannot say admission of [the granddaughter's] testimony caused the verdict to be the

---

[35] The jury was instructed as follows:

> The prosecution has introduced what is known as victim impact evidence. This evidence has been introduced to show the financial, emotional, psychological, or physical effects of the victim's death on the members of the victim's immediate family. It is intended to remind you as the sentencer that just as the defendant should be considered as an individual, so too the victim is an individual whose death may represent a unique loss to society and the family. This evidence is simply another method of informing you about the specific harm caused by the crime in question. You may consider this evidence in determining an appropriate punishment. However, your consideration must be limited to a moral inquiry into the culpability of the defendant, not an emotional response to the evidence.

> As it relates to the death penalty: Victim impact evidence is not the same as an aggravating circumstance. Proof of an adverse impact on the victim's family is not proof of an aggravating circumstance. Introduction of this victim impact evidence in no way relieves the State of its burden to prove beyond a reasonable doubt at least one aggravating circumstance which has been alleged. You may consider this victim impact evidence in determining the appropriateness of the death penalty only if you first find that the existence of one or more aggravating circumstance has been proven beyond a reasonable doubt by evidence independent from the victim impact evidence, and find that the aggravating circumstance or circumstances found outweigh the finding of one or more mitigating circumstances.

> As it relates to the other sentencing options: You may consider this victim impact evidence in determining the appropriate punishment as warranted under the law and facts in the case.

(O.R. VII, 1239-40).

result of an unreasonable emotional response.  Accordingly, we find no plain error, and this assignment of error is denied.

Id. at 348.

Although Petitioner asserts that admission of the complained of testimony violates Payne, Petitioner's argument is simply a regurgitation of the arguments he made to the OCCA on direct appeal.  Rather than presenting argument as to why the OCCA should have granted him relief after finding a statutory violation, Petitioner virtually ignores the OCCA's holding and falls back on argument which has since been nullified by the OCCA's decision. Petitioner's argument focuses on why the granddaughter should not have been allowed to testify.  However, the OCCA has already concluded that allowance of her testimony was error.  Petitioner's argument is therefore irrelevant and unhelpful.

In Payne, the Supreme Court held that the Eighth Amendment does not erect a per se bar to the admission of victim impact evidence.  "A State may legitimately conclude that evidence about the victim and about the impact of the murder on the victim's family is relevant to the jury's decision as to whether or not the death penalty should be imposed." Payne, 501 U.S. at 827.  While this evidence does not violate the Eighth Amendment, the Court in Payne acknowledged that a Fourteenth Amendment violation may be found where the evidence introduced "is so unduly prejudicial that it renders the trial fundamentally unfair." Id. at 825.  Having reviewed the granddaughter's testimony, the Court finds that its admission did not render Petitioner's trial fundamentally unfair.  As the OCCA noted, the testimony was brief, partially cumulative, and, for the most part,

71

unemotional.  The jury was also given an appropriate instruction on its consideration of this evidence.  Under these circumstances, the OCCA's determination that the testimony did not cause an unreasonable, emotional verdict is not contrary to or an unreasonable application of <u>Payne</u>.  Relief is therefore denied as to Petitioner's Ground Ten.

### K.    Ground Eleven:    Prosecutorial Misconduct.

In his Ground Eleven, Petitioner raises a claim of prosecutorial misconduct.  Petitioner contends that during the questioning of a witness in the first stage, the prosecutor injected hearsay statements into evidence.  Petitioner also complains about the prosecutor's reference to those statements in second stage closing argument. Petitioner asserts that these actions violated his constitutional right to confrontation.  Because no objection was made at trial, Petitioner additionally asserts both trial and appellate counsel ineffectiveness. With reference to the OCCA's decisions on direct appeal and post-conviction, Respondent argues that Petitioner is not entitled to relief because he has not shown an unreasonable application of Supreme Court law.

Generally, allegations of prosecutorial misconduct are subjected to due process review.  <u>Hamilton v. Mullin</u>, 436 F.3d 1181, 1187 (10th Cir. 2006).  The question is whether the prosecutor's actions or remarks "so infected the trial with unfairness as to make the resulting conviction a denial of due process." <u>Donnelly v. DeChristoforo</u>, 416 U.S. 637, 643 (1974). However, a different standard applies where, as here, a petitioner asserts the denial of a specific constitutional right. "When specific guarantees of the Bill of Rights are

involved, . . . special care [is taken] to assure that prosecutorial conduct in no way impermissibly infringes them." Donnelly, 416 U.S. at 643. "[A] claim that the misconduct effectively deprived the defendant of a specific constitutional right . . . may be the basis for habeas relief without proof that the entire proceeding was unfair." Paxton v. Ward, 199 F.3d 1197, 1217 (10th Cir. 1999).

On direct appeal, Petitioner complained about the prosecutor's redirect examination of Inspector McKenna. Petitioner's objection concerned the following line of questioning:

> Q.    Well, you were talked to about the Miller interviews and, to be fair, neither side, them or us, gave you the transcripts. You have not read the stacks of the transcripts of the Miller interview, right?
>
> A.    No, sir, I have not.
>
> Q.    Okay. *When Robert Miller is asked about what he saw, he, the killer -- never himself -- he saw the killer do and he describes the raping, the oral sodomy that he saw, the begging for lives. And he's asked the question, why did he kill her? And his first answer is I don't know. He's asked again, why did he kill her? And the answer is, he was scared. Scared of what? She was going to tell on him.*
>
> Now, I understand you haven't reviewed this, so whether or not he was led to these statements or whether and whether -- and to be very clear, I agree a hundred percent with Mr. Albert and the rest of those folks over there for what it's worth, the State's position is that Robert Miller's statements reflect that he was present and we're going to talk more about that later. You may not agree with that. Bob Thompson sure doesn't.
>
> But my point to you is is that if Robert Miller was there or he had some other way of learning what [Petitioner] was thinking, this answer, he killed her because he was scared she would tell on him, is that consistent with your opinion that this was a rape/murder done to kill in order to silence a witness?

73

A.     Yes, sir, it is.

(II Trial Tr. VIII, 1492-93) (emphasis added).  Petitioner argued that Mr. Miller's statements

were impermissible hearsay and that the prosecutor injected the statements to prove the avoid

arrest aggravator.  Petitioner also contended that the prosecutor "put before the jury that the

victims begged for their lives and were orally sodomized."  Even though no objection was

made, Petitioner argued that relief was required due to prejudice.  He argued that prejudice

was demonstrated by the prosecutor's reference to the statements in second stage closing

arguments, although no objection was raised to this comment either (II Trial Tr. X, 1796).

Brief of Appellant, Case No. D-2002-88, pp. 82-85.

Due to the lack of an objection, the OCCA reviewed the claim for plain error.  Lott,

98 P.3d at 345.  As to the questioning of Inspector McKenna, the OCCA found that defense

counsel opened the door on cross-examination and therefore Petitioner was precluded from

relief under the invited error doctrine.

> Inspector McKenna first testified to Robert Miller's involvement in the
> case on cross-examination.  Defense counsel cross-examined McKenna
> extensively  on  statements  made  by  Miller  despite  McKenna's
> acknowledgement that he never interviewed Miller and was not aware of the
> substance of Miller's statements.  Defense counsel repeatedly reviewed
> statements made by Miller and asked McKenna his opinion as to whether or
> not the person making those statements would have been at the scene of the
> crime.
>
> . . . .
>
> Any error in McKenna's testimony concerning Miller's statements has
> been waived as defense counsel, and not the State, opened up the issue of
> Miller's statements with McKenna.  In fact, the State objected to the

questioning during cross-examination for the reason that McKenna had not read all of Miller's statements. The trial court overruled the objection and permitted the questioning. This Court has repeatedly held that an appellant will not be permitted to profit by an alleged error that he or his counsel in the first instance invited by opening the subject or by his or her own conduct, and counsel for the defendant may not profit by whatever error was occasioned by the admission of such incompetent evidence.

Id. (footnote omitted) (citations omitted).

Petitioner reasserts his claim here. He argues that the OCCA's decision is unreasonable because the prosecutor's questioning clearly violated his right to confront the witnesses against him. Petitioner also takes issue with the OCCA's determination that Inspector McKenna did not testify that, based on Mr. Miller's statements, the victims begged for their lives and were orally sodomized.[36]

The record supports the OCCA's determination that defense counsel opened the door to Mr. Miller's statements. On cross-examination, defense counsel used Mr. Miller's statements regarding the Fowler/Cutler homicides to challenge Inspector McKenna's opinion that the Marshall/Hoster and Fowler/Cutler crimes were related and that Petitioner alone committed them all. Defense counsel told Inspector McKenna, who was unaware of the

---

[36] The prosecutor's reference to what Mr. Miller saw the killer do was extraneous information, unnecessary to support and/or to lead into the question being posed to Inspector McKenna. The question actually posed to Inspector McKenna did not include this information, but only Mr. Miller's statement as to why a victim was killed, i.e., "because he was scared she would tell on him." Given that statement, the question was whether that statement was consistent with Inspector McKenna's opinion (II Trial Tr. VIII, 1493). The prosecutor made no further reference to Mr. Miller's statement regarding the oral sodomy and begging. Under these circumstances, the Court cannot conclude that the OCCA unreasonably determined the substance of Inspector McKenna's testimony, nor unreasonably denied relief on this issue.

substance of the statements, that Mr. Miller accurately told police that the headboard of one of the victims was rounded; that one of the victims had a cross over her bed; that one of the victims had clasps on her windows that prevented the perpetrator from getting in that way; and that when the electricity is turned on at the one of the victims' residences, a single light will come on. Defense counsel also told him that Mr. Miller's statements included comments on how the killer felt during the commission of the crimes, that the killer did not like a certain group of people, and that he committed the crimes for certain reasons (II Trial Tr. VIII, 1476-85).

The OCCA's denial of relief based upon the invited error doctrine is therefore reasonable. See Parker v. Champion, 148 F.3d 1219, 1221-22 (10th Cir. 1998) (acknowledging Oklahoma's application of the invited error rule and denying a habeas claim that the state trial court erred in giving an instruction which the defendant requested). Defense counsel clearly opened the matter up on cross-examination. Even when the prosecutor objected to the inquiry on foundation grounds, the defense stood firm and offered to introduce Mr. Miller's complete videotaped statements, all seventeen hours worth, in order to overcome the objection and pursue the line of questioning. Although the objection was overruled and defense counsel was permitted to proceed without introduction of the videotaped statements, defense counsel's intention was clear and purposeful (II Trial Tr. VIII, 1483).

In United States v. Lopez-Medina, 596 F.3d 716 (10th Cir. 2010), the Tenth Circuit addressed this same issue. In that case, the defendant complained about the prosecutor's introduction of a confidential informant's statements on redirect. In response to the alleged Confrontation Clause violation, the prosecution argued that the defendant had opened the door to the evidence on cross-examination. Describing the Confrontation Clause as "a shield, not a sword," the Court agreed. Lopez-Medina, 596 F.3d at 732. "Where . . . defense counsel purposefully and explicitly opens the door on a particular (and otherwise inadmissible) line of questioning, such conduct operates as a limited waiver allowing the government to introduce further evidence on that same topic." Id. at 731. Such is the case here.

In second stage closing argument, the prosecutor made a second reference to Mr. Miller's statement regarding why the killer killed one of the victims. Discussing Inspector McKenna's opinion that the victims were killed to silence them, the prosecutor stated:

> Robert Miller. Robert Miller in his interview with David Shupe. Why did he kill her? I don't know. Why did he kill her? He was scared. Scared of what? She was going to tell on him.
>
> You hardly needed that statement from Robert Miller to confirm that the reason why the defendant did it is she was going to tell on him because that's what Grace Marshall and Eleanor Hoster did when he left them alive.

(II Trial Tr. X, 1796). In denying relief on this portion of Petitioner's claim, the OCCA found as follows:

77

The record shows that in support of the aggravator of "avoid arrest", the State presented Inspector McKenna's expert opinion that the murders were committed to eliminate witnesses. McKenna testified his opinion was not based upon any statements made by Robert Miller, but on his years of investigating hundreds of sexually related homicides. McKenna testified Miller's statement simply corroborated his opinion. The prosecutor's comments during closing argument were based on the evidence and did not deprive [Petitioner] of a fair sentencing proceeding.

Lott, 98 P.3d at 346 (citation omitted). In light of the facts that the defense opened the door to this evidence and made no objection to this subsequent comment, the Court finds that this determination by the OCCA is reasonable as well.

As noted above, within his Ground Eleven, Petitioner raises an additional claim regarding the ineffectiveness of his trial and appellate counsel with respect to their handling of this claim. Petitioner asserts that his trial counsel was ineffective in allowing Mr. Miller's hearsay statements and that appellate counsel was ineffective for failing to allege this aspect of trial counsel ineffectiveness. Petitioner states that he raised this additional claim in post-conviction and Respondent does not dispute this assertion, but simply addresses the matter on the merits. However, the Court's review of Petitioner's post-conviction application reveals that this claim was not raised. Although Petitioner made mention of the fact that "[t]he whole trial was permeated with references to Robert Miller," Petitioner did so tangentially at best. Application for Post-Conviction Relief, Case No. PC-2002-961, pp. 24-25. Nowhere within his Proposition One did Petitioner refer to the issue raised on direct appeal and/or the OCCA's application of plain error review and the invited error doctrine to it. Petitioner did not alert the OCCA to a Confrontation Clause violation or allege in any way

that his counsels' actions caused him prejudice by the introduction of impermissible hearsay. Under these circumstances, this claim regarding Petitioner's counsels' ineffectiveness is clearly unexhausted. See Wilson v. Workman, 577 F.3d 1284, 1294 (10th Cir. 2009) (exhaustion requires fair presentation; a claim is fairly presented when its substance is raised and the state courts are given the opportunity to apply controlling legal principles to the constitutional claim). See also Odum v. Boone, 62 F.3d 327, 332 n.2 (10th Cir. 1995) ("[A] court may raise the defense of nonexhaustion *sua sponte*."). Because it would be futile for Petitioner to return to state court to exhaust the claim, the Court finds it should be procedurally barred. See Steele v. Young, 11 F.3d 1518, 1523 n.10, 1524 (10th Cir. 1993) (raising the nonexhaustion issue *sua sponte* and procedurally barring the claim).

In an effort to overcome the application of a procedural bar, Petitioner argues that this Court should not recognize Oklahoma's procedural bar doctrine because it has not been consistently applied. See Spears, 343 F.3d at 1254 ("A state procedural-default rule will be adequate if the state courts apply it regularly and consistently."). In support of his argument, Petitioner cites two OCCA cases, an unpublished decision and Valdez v. State, 46 P.3d 703 (Okla. Crim. App. 2002), wherein the OCCA addressed the merits of claims raised in subsequent post-conviction applications. Reply, pp. 2-3. This argument has been previously raised and rejected. See Spears, 343 F.3d at 1253-55; Black v. Workman, No. CIV-02-225-C, 2010 WL 565285, at *7-10 (W.D. Okla. Feb. 10, 2010) (unpublished). Because Petitioner makes no effort to satisfy an exception to the application of a procedural bar, it stands to

preclude consideration of this claim of trial and appellate counsel ineffectiveness. <u>See</u> <u>Hickman v. Spears</u>, 160 F.3d 1269, 1272 (10th Cir. 1998) (noting that the application of a procedural bar can be overcome by a petitioner's showing of cause and prejudice or a fundamental miscarriage of justice).

Even if the claim were not barred, Petitioner would still not be entitled to relief. To obtain relief on a claim of ineffective assistance of counsel, a petitioner must show that his counsel's performance was deficient and that he was prejudiced by it. <u>Strickland</u>, 466 U.S. at 687. <u>See</u> Article IV.D., <u>supra</u> (discussing the <u>Strickland</u> standard). Petitioner can show neither.

As noted herein, trial counsel intentionally delved into the Miller statements. It was clearly part of the trial strategy. Faced with damaging DNA evidence implicating Petitioner, trial counsel embraced the involvement of Mr. Miller, the statements he made, and his initial convictions for the crimes. Trial counsel even presented David Shupe, who interviewed Mr. Miller, as a defense witness. Trial counsel stirred the issue of reasonable doubt by assessing blame on Mr. Miller and questioning the prosecution's handling of the cases and its reliance on science to first convict Mr. Miller and then Petitioner. <u>See</u> <u>Lott</u>, 98 P.3d at 337 ("To counter the State's evidence at trial, the defense showed that the scientific evidence relied upon 14 years ago to convict Robert Miller of the Fowler/Cutler crimes — hair and blood analysis — had since been proven unreliable. Defense counsel questioned whether

DNA analysis might not also go the way of hair and blood analysis in light of future advances in forensic testing.").

In addition, Petitioner was not prejudiced by trial counsel's actions. In order to make a threshold showing of actual prejudice, <u>Strickland</u> requires a petitioner to "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." <u>Strickland</u>, 466 U.S. at 694. Given the overwhelming DNA evidence, it cannot be said that counsel's actions altered the outcome. Because Petitioner's claim of trial counsel ineffectiveness is without merit, appellate counsel was also not ineffective for failing to raise it. <u>See</u> <u>Duckett v. Mullin</u>, 306 F.3d 982, 998 (10th Cir. 2002) ("Because trial counsel was not ineffective, appellate counsel correlatively cannot be ineffective for failing to raise a dependent ineffectiveness claim.").

In conclusion, for the reasons set forth herein, Petitioner is not entitled to relief on his Ground Eleven. Relief is therefore denied.

**L.  Ground Twelve:  Insufficient Evidence of the Avoid Arrest Aggravator.**

In his Ground Twelve, Petitioner asserts that the evidence was insufficient to support the avoid arrest aggravator. Petitioner raised this claim on direct appeal. The OCCA denied relief. <u>Lott</u>, 98 P.3d at 348-49. Respondent asserts that Petitioner is not entitled to relief on his claim because he has failed to show that the OCCA's decision is contrary to or an unreasonable application of Supreme Court law.

The Jackson v. Virginia, 443 U.S. 307 (1979), sufficiency of the evidence standard applies when an aggravator is challenged for lack of supporting evidence. LaFevers v. Gibson, 182 F.3d 705, 723 (10th Cir. 1999). Thus, the question is "whether, viewing the evidence in a light most favorable to the State, there was sufficient evidence for any rational fact finder to find this aggravating factor beyond a reasonable doubt." Romano v. Gibson, 278 F.3d 1145, 1154 (10th Cir. 2002). This Court "must accept the jury's determination as long as it is within the bounds of reason," and review is even more limited under the deferential AEDPA standards. Boltz v. Mullin, 415 F.3d 1215, 1232 (10th Cir. 2005).

With reference to his Grounds Nine and Eleven, Petitioner contends, as he did on direct appeal, that the evidence upon which the State relied to support the avoid arrest aggravator was inadmissible. When Inspector McKenna's opinion and Mr. Miller's statements are excluded, Petitioner asserts that no evidence is left upon which to support a finding of the aggravator. Petitioner additionally contends that the evidence did not show that the rapes were separate and distinct from the murders.

The jury was instructed that in order to prove the avoid arrest aggravator, the State was required to show beyond a reasonable doubt that (1) "there was another crime separate and distinct from the murder;" and (2) Petitioner "committed the murder with the intent to avoid being arrested or prosecuted for that other crime" (O.R. VII, 1236). See Gilbert v. Mullin, 302 F.3d 1166, 1181-82 (10th Cir. 2002) (setting forth Oklahoma law on the avoid arrest aggravator). The OCCA has held that intent can be proved by a defendant's own

82

statements or through circumstantial evidence. <u>Romano v. Gibson</u>, 239 F.3d 1156, 1179 (10th Cir. 2001).

Although the OCCA found no error in the admission of Inspector McKenna's expert opinion and Mr. Miller's statements, the OCCA did not specifically rely upon that evidence to find that sufficient evidence of intent was shown. The OCCA reasoned as follows:

> In the present case, the evidence showed [Petitioner] subdued and raped both victims. While [Petitioner] and the victims did not know one another, there is no indication [Petitioner] attempted to hide his identity during the rape. That the victims could have identified their assailant if left alive is sufficient to support the conclusion that the victims were killed in order to prevent their identification of [Petitioner] and his subsequent arrest and prosecution.

<u>Lott</u>, 98 P.3d at 348 (citations omitted). When Inspector McKenna's testimony is also considered, and given its consistency with Mr. Miller's statements, the OCCA's finding of sufficient evidence of intent is reasonable. The evidence was clearly sufficient for the jury to find that Petitioner's reason for killing Mrs. Fowler and Ms. Cutler was to avoid arrest or prosecution.

As to whether the rapes were separate from the murders, the OCCA held as follows:

> The evidence in the present case shows the victims' deaths were not the result of the rape. Both victims died as a result of asphyxiation. The evidence at both crime scenes revealed numerous bruises on the victims' arms indicating they had been bound by the hands. Further, both victims suffered fractured ribs that [Petitioner] concedes was consistent with the perpetrator having sat on the victim. However, the existence of pillows, and their condition, at both scenes supports the inference [Petitioner] sat on the victims after the completion of the rape and smothered them. Reviewing this evidence in the light most favorable to the State, a rational jury could have found beyond a reasonable doubt the rapes were distinct and separate crimes from the murders, and that [Petitioner] killed the victims in order to avoid lawful arrest or prosecution.

<u>Lott</u>, 98 P.3d at 348-49.  Again, this holding is a reasonable one.  In light of the evidence presented, the jury's verdict is amply supported. Petitioner's Ground Twelve is denied.

### M.     Ground Thirteen:  Prosecutorial Misconduct in the Second Stage.

In his Ground Thirteen, Petitioner raises another claim of prosecutorial misconduct. Here, Petitioner complains about questions posed by the prosecutor to a defense witness in the second stage.  Petitioner raised this claim on direct appeal.  The OCCA denied relief. <u>Lott</u>, 98 P.3d at 349-51.  Petitioner contends that the error entitles him to a new sentencing proceeding.   Respondent asserts that the OCCA's decision is not contrary to or an unreasonable application of Supreme Court law.  Accordingly, Respondent urges the denial of relief.

Petitioner's complaint is with the prosecutor's recross examination of Jason Ledford. Mr. Ledford, a detention officer at the Oklahoma County Jail, was presented by the defense to testify as to Petitioner's behavior while incarcerated there.  Mr. Ledford, who had known Petitioner for two to three years, testified on direct examination that Petitioner was housed in an honor pod, that he was not a bad person, that he had never had any problems with him, and that he had never seen Petitioner be violent (II Trial Tr. X, 1740-44).  Mr. Ledford was the second witness presented by the defense regarding Petitioner's behavior while incarcerated.  Charles Harris, a supervisor for Oklahoma Correctional Industries, testified that Petitioner worked for him while he was incarcerated for the Marshall/Hoster rapes.  Like

Mr. Ledford, Mr. Harris also testified that Petitioner was not violent. Mr. Harris described Petitioner as a good worker, dependable and fun to work with (II Trial Tr. X, 1723).

On cross-examination of Mr. Ledford, the prosecutor questioned him about the benefits of an inmate's good behavior, i.e., privileges (like the telephone in Petitioner's honor pod cell) and early release (Petitioner's discharge of his 25-year sentence for the Marshall/Hoster rapes in ten years) (II Trial Tr. X, 1748-50). On redirect, defense counsel asked Mr. Ledford how quickly an inmate could discharge a life without parole sentence. Mr. Ledford responded, "I don't think you discharge life without parole. . . . That's life" (II Trial Tr. X, 1750). In response to this question, an in camera hearing was held. In light of the question posed, the prosecutor indicated his desire to make further inquiry into the details of a life without parole sentence.

> You don't discharge life without parole, but where you go inside the penitentiary system makes all the difference in the world. So for example, he doesn't have to be in the kind of place he was in the Oklahoma County Jail, locked down in a cell except for one hour out, like they have at H Unit. He can get back out in general population, in medium security behind a fence. He can get out on supervised work detail, he can have contact visits, and he has an opportunity to escape, to get access to weapons.

(II Trial Tr. X, 1751). The prosecutor argued that the evidence concerned Petitioner's behavior while incarcerated and was relevant to the issue of continuing threat. Petitioner's "behavior is such that he can adjust to life in the joint," the prosecutor said. "By manipulating his behavior the way that he has, he can get access to escape, to weapons to hurt other

correctional officers or escape and get access to other old ladies." The trial court permitted

the inquiry (II Trial Tr. X, 1751-52).

Petitioner's complaint lies with the following questions posed:

Q.     And he said that while he's in the joint serving his two rape convictions, there he has a chance for sunshine, he has a chance to do - - to be outside, to participate in programs, to associate with other folks, and of course you were sitting in the courtroom here while this tag fellow was talking, right?

A.     Brief part of it.

Q.     Okay.  Did you hear the part where he's saying murderers and rapists, folks serving the kind of sentences that draw life without parole, are eligible to get out of a cell for very, very large portions of the day throughout the entire week, access to shears and knives and other weapons in the course of the day?

A.     Right.

Q.     Now, when somebody knows that by not causing trouble they can get out, you all use that to help people to behave, right?

A.     Yes.

Q.     If a guy is serving a life without parole sentence and the best he can hope for is either escape or become satisfied to spend the rest of your life there, getting in one of those outside placements outside the wall or outside of a cell placements is a pretty good thing, huh?

A.     Yes.

(II Trial Tr. X, 1753-54).  Although no contemporaneous objection to the questioning was

raised, defense counsel did seek a mistrial at the conclusion of recross, alleging that the

questions were improper and were posed in an effort to raise societal alarm.  The trial court

found no error in the questioning (II Trial Tr. X, 1755).

On direct appeal, the OCCA found that the prosecutor's questioning on recross was occasioned by the testimony of Mr. Harris and Mr. Ledford. Because the defense "put [Petitioner's] character and conduct while incarcerated at issue," the OCCA held that the prosecution was permitted "to cover this same subject during cross examination." Lott, 98 P.3d at 350 (citations omitted). "The State was entitled to introduce evidence of bad character by showing that [Petitioner] was not truly non-violent but merely knew what it took to get a placement outside of the prison walls." Id. "The prosecutor's questions to Ledford were relevant in contradicting [Petitioner's] evidence that he was non-violent and in supporting the alleged 'continuing threat' aggravator." Id. The OCCA also found that the prosecutor's questions did not prohibit the jury from considering the mitigating circumstances. "The jury was appropriately instructed as to the mitigating evidence and was not in any way precluded from considering any and all mitigating evidence. In fact, the jury rejected the 'continuing threat' aggravator." Id. at 350-51.

The OCCA's decision is not contrary to or an unreasonable application of Donnelly, 416 U.S. at 643. See Article IV.K., supra (discussing the standard of review for claims of prosecutorial misconduct). The questions posed by the prosecutor were relevant and in response to the evidence presented by the defense witnesses. Accordingly, they did not infect Petitioner's trial with unfairness. They also did not infringe Petitioner's constitutional right to present mitigation evidence. The questions were related to the issue of Petitioner as a continuing threat. While the defense argued that Petitioner could be a model prisoner if

given a life without parole sentence, the sentence the defense requested the jury to return (II Trial Tr. X, 1816), the prosecutor argued that Petitioner's past conduct could have been motivated by his desire to obtain early release, and that if Petitioner received a life without parole sentence, that motivation would be absent and he would have no incentive to maintain good behavior. In any event, the prosecutor's argument was unavailing. The jury did not find Petitioner to be a continuing threat (O.R. VII, 1250-51, 1253-54). Under these circumstances, the Court cannot find that the OCCA rendered an unreasonable decision. Accordingly, relief is denied as to Petitioner's Ground Thirteen.

### N. Ground Fourteen: Aggravating Circumstances.

In his Ground Fourteen, Petitioner alleges that his Fifth, Sixth, and Fourteenth Amendment rights were violated due to the State's failure to include the aggravating circumstances in the charging information.[37] Petitioner relies upon the Supreme Court's holdings in Jones v. United States, 526 U.S. 227 (1999), Apprendi v. New Jersey, 530 U.S. 466 (2000), and Ring v. Arizona, 536 U.S. 584 (2002), to support his claim. Petitioner presented this claim on direct appeal and the OCCA denied relief. Lott, 98 P.3d at 349. As

---

[37] Flowing from this argument, Petitioner additionally asserts that he should have been given a preliminary hearing on the aggravating circumstances, and that in absence of the same, the trial court did not have jurisdiction over the aggravating circumstances. Petitioner does not claim that he lacked notice of the aggravating circumstances. Petitioner received notice of the aggravating circumstances through a Bill of Particulars filed the day he was bound over for trial (O.R. II, 249-50). See Lott, 98 P.3d at 349 ("[Petitioner] concedes he was informed of the aggravating circumstances in his case pursuant to state law.").

Respondent contends, because Petitioner has not shown that the OCCA's decision is contrary to or unreasonable application of <u>Jones</u>, <u>Apprendi</u>, and <u>Ring</u>, his claim must be denied.

In <u>Jones</u>, the Supreme Court interpreted the federal carjacking statute as setting forth three separate offenses, "each of which must be charged by indictment, proven beyond a reasonable doubt, and submitted to a jury for its verdict." <u>Jones</u>, 526 U.S. at 252. In <u>Apprendi</u>, the Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed maximum must be submitted to a jury, and proved beyond a reasonable doubt." <u>Apprendi</u>, 530 U.S. at 490. In <u>Ring</u>, the Court applied <u>Apprendi</u> to capital defendants. "Capital defendants, no less than noncapital defendants, . . . are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment." <u>Ring</u>, 536 U.S. at 589. Petitioner argues that the Supreme Court's holding in <u>Ring</u> made the <u>Jones</u> holding applicable to aggravating circumstances in state prosecutions.

The OCCA correctly found that <u>Ring</u> is not as broad as Petitioner contends. <u>Lott</u>, 98 P.3d at 349. Like <u>Apprendi</u>, <u>Ring</u> is a Sixth Amendment case, concerned only with a defendant's right to trial by jury. <u>Ring</u>, 536 U.S. at 597 ("The question presented is whether that aggravating factor may be found by the judge, as Arizona law specifies, or whether the Sixth Amendment's jury trial guarantee, made applicable to the States by the Fourteenth Amendment, requires that the aggravating factor determination be entrusted to the jury.") (footnotes omitted); <u>Apprendi</u>, 530 U.S. at 476-77 ("At stake in this case are constitutional

protections of surpassing importance: the proscription of any deprivation of liberty without 'due process of law,' Amdt. 14, and the guarantee that '[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury,' Amdt. 6.") (footnote omitted). Ring did not address the sufficiency of the charging document because that issue was not raised. Ring, 536 U.S. at 597 n.4. For the same reason, the issue was also not addressed in Apprendi. Apprendi, 530 U.S. 477 n.3. However, in both Apprendi and Ring, the Court expressly acknowledged the limitation of any such claim given the inapplicability of the Fifth Amendment right to indictment by a grand jury to the States. Ring, 536 U.S. at 597 n.4 (citing Apprendi); Apprendi, 530 U.S. at 477 n.3 ("[The Fourteenth] Amendment has not, however, been construed to include the Fifth Amendment right to 'presentment or indictment of a Grand Jury. . . .'"). See also Alexander v. Louisiana, 405 U.S. 625, 633 (1972) ("Although the Due Process Clause guarantees petitioner a fair trial, it does not require the States to observe the Fifth Amendment's provision for presentment or indictment by a grand jury."); Minner v. Kerby, 30 F.3d 1311, 1318 (10th Cir. 1994) ("[T]he Fifth Amendment right to grand jury indictment does not apply to states.").

In order to obtain relief, Petitioner must show that the OCCA unreasonably applied Supreme Court law. 28 U.S.C. § 2254(d)(1). The cases relied upon by Petitioner simply do not support his position. Other district courts which have addressed this issue have reached the same conclusion. See Poyson v. Ryan, 685 F.Supp.2d 956, 999 (D. Ariz. 2010); Moeller v. Weber, 635 F.Supp.2d 1036, 1060-63 (D.S.D. 2009); Cole v. Roper,

579 F.Supp.2d 1246, 1274-75 (E.D. Mo. 2008). See also Powell v. Kelly, 531 F.Supp.2d 695, 734 (E.D. Va. 2008) (addressing the claim within a claim of ineffective assistance of counsel). Likewise, Petitioner's Ground Fourteen is denied.

### O.      Ground Fifteen:      Ineffective Assistance of Trial Counsel.

In his Ground Fifteen, Petitioner raises a claim of trial counsel ineffectiveness. Petitioner's complaint concerns the mitigation case presented, and particularly the absence of evidence regarding his background. Petitioner asserts that his trial counsel were ineffective for (1) failing to conduct a sufficient investigation, including the obtaining of a social history report; (2) failing to even present the background information they had; and (3) failing to obtain his consent not to present any background information. Petitioner presented this claim to the OCCA in a Rule 3.11 motion for an evidentiary hearing. The OCCA denied Petitioner's motion. Lott, 98 P.3d at 351-57. Respondent argues that Petitioner is not entitled to relief on his claim because the OCCA's decision is not contrary to or an unreasonable application of Strickland.

### 1.      Standard of Review.

Petitioner's claim was presented to the OCCA through a Rule 3.11 motion because it relied upon matters outside of the record. While thoroughly addressing the non-record evidence, the OCCA reviewed Petitioner's claim within its Rule 3.11 framework and denied Petitioner his requested evidentiary hearing because he "failed to show by clear and convincing evidence a strong possibility that defense counsel was ineffective for failing to

investigate further and utilize the complained-of evidence." Lott, 98 P.3d at 351-57. In Wilson, the Tenth Circuit determined that this analysis of an ineffectiveness claim is not owed AEDPA deference. "This is an explicit application of the Rule 3.11 standard which . . . does not replicate the federal standard and therefore does not constitute an adjudication on the merits as to whether [Petitioner's] non-record evidence could support his Strickland claim. A federal court therefore does not owe deference to the OCCA's rejection of [Petitioner's] ineffectiveness claim." Wilson, 577 F.3d at 1300. Thus, in accordance with Wilson, Petitioner's claim is subject to de novo review.

### 2. Applicable Law.

As previously discussed herein, the well-known standard for ineffectiveness claims is set forth in Strickland. To obtain relief under Strickland, a petitioner must show that his counsel's performance was deficient and that he was prejudiced by it. Strickland, 466 U.S. at 687. The assessment of counsel's conduct is "highly deferential," and a petitioner must overcome the strong presumption that counsel's actions constituted sound trial strategy. Id. at 689. "There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." Id. As to prejudice, "[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." Id. at 693. "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability

sufficient to undermine confidence in the outcome." Id. at 694. "When a defendant challenges a death sentence . . ., the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." Id. at 695.

In Strickland, the Supreme Court addressed the very claim raised here, i.e., the effectiveness of counsel with respect to the investigation and presentation of mitigating evidence in a capital case. The Court held as follows:

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

Id. at 690-91.

In Wiggins v. Smith, 539 U.S. 510 (2003), the Supreme Court addressed another ineffectiveness claim based upon a failure to investigate. In Wiggins, trial counsel presented no evidence of Wiggins' life history. Instead, during the sentencing phase of Wiggins' capital trial, counsel focused on Wiggins' responsibility for the murder.[38] With reliance on

---

[38] In Maryland, in order for a defendant to be death eligible, proof of direct responsibility was required. Wiggins, 539 U.S. at 515-16.

Strickland, the Court found that the issue was "not whether counsel should have presented a mitigation case[,] [but] . . . whether the investigation supporting counsel's decision not to introduce mitigating evidence of Wiggins' background *was itself unreasonable*." Id. at 523.

In Wiggins, the Court found trial counsel's investigation was unreasonable because "counsel abandoned their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources." Id. at 524. The record showed that counsel's investigation drew from only three sources:

(1) Tests conducted by a psychologist which revealed that Wiggins "had an IQ of 79, had difficulty coping with demanding situations, and exhibited features of a personality disorder."

(2) A presentence investigation report (PSI) which contained a "one-page account of Wiggins' personal history noting his misery as a youth, quoting his description of his own background as disgusting, and observing that he spend most of his life in foster care."

(3) Department of Social Services documents (DSS) which documented Wiggins' "various placements in the State's foster care system." These documents revealed that Wiggins' "mother was a chronic alcoholic; Wiggins was shuttled from foster home to foster home and displayed some emotional difficulties while there; he had frequent, lengthy absences from school; and on at least one occasion, his mother left him without food."

Id. at 523-25 (internal quotations omitted). The Court found that "[c]ounsel's decision not to expand their investigation beyond the PSI and the DSS records fell short of the professional standards that prevailed in Maryland in 1989." In particular, it was standard practice to obtain a social history report. Id. at 524. In addition, "any reasonably competent

attorney would have realized that pursuing . . . leads [from the DSS records] was necessary to making an informed choice among possible defenses. . . ." Id. at 525.

Subsequent to trial, a social history report was prepared. It documented "the severe physical and sexual abuse [Wiggins] suffered at the hands of his mother and while in the care of a series of foster parents. Relying on state social services, medical, and school records, as well as interviews with [Wiggins] and numerous family members, [the report] chronicled petitioner's bleak life history." Id. at 516.

> According to [the] report, [Wiggins'] mother, a chronic alcoholic, frequently left Wiggins and his siblings home alone for days, forcing them to beg for food and to eat paint chips and garbage. Mrs. Wiggins' abusive behavior included beating the children for breaking into the kitchen, which she often kept locked. She had sex with men while her children slept in the same bed and, on one occasion, forced [Wiggins'] hand against a hot stove burner—an incident that led to [Wiggins'] hospitalization. At the age of six, the State placed Wiggins in foster care. [Wiggins'] first and second foster mothers abused him physically, . . . and, as [Wiggins] explained . . . , the father in his second foster home repeatedly molested and raped him. At age 16, [Wiggins] ran away from his foster home and began living on the streets. He returned intermittently to additional foster homes, including one in which the foster mother's sons allegedly gang-raped him on more than one occasion. After leaving the foster care system, Wiggins entered a Job Corps program and was allegedly sexually abused by his supervisor.

Id. at 516-17 (citations omitted). Describing this mitigation evidence as "powerful," the Court found that a "competent attorney, aware of this history, would have introduced it at sentencing . . .[,]" and that there was a "reasonable probability that [the jury] would have returned with a different sentence" had it been presented with this information. Id. at 535, 536.

**3.    Evidence Presented in the Second Stage.**

**a.    State's Evidence.**

The aggravating circumstances alleged by the State were (1) especially heinous, atrocious, or cruel; (2) murder to avoid arrest or prosecution; and (3) continuing threat (O.R. II, 249-50). In the second stage, the State presented no additional evidence in support of these aggravators. The State simply incorporated the first stage evidence into the second stage (II Trial Tr. IX, 1693). In support of the especially heinous, atrocious, or cruel aggravator, the State's evidence detailed the physical injuries sustained by the victims, including rib fractures, bruising, bleeding, and vaginal tears. In addition to the physical pain, there was also mental anguish associated with being suffocated with a pillow. As to the avoid arrest aggravator, the State's evidence showed that Petitioner suffocated the victims after raping them to avoid arrest or prosecution. For continuing threat, the State pointed to the crimes themselves, as well as the Marshall/Hoster rapes.

The State did present victim impact testimony in the second stage. Three members of Mrs. Fowler's family testified. While their testimony was brief, all three recommended that Petitioner be given the death penalty (II Trial Tr. X, 1693-1703).

**b.    Defense's Evidence.**

The focus of the second stage for the defense was Petitioner's actions since the crimes occurred. In second stage opening statement, trial counsel told the jurors that the evidence would show that Petitioner had been incarcerated since May 1987, and that Petitioner's

behavior and characteristics since that time "are entirely opposite or diametrically opposed to the violence, the horribleness that [they've] seen in regard to these crimes" (II Trial Tr. IX, 1691). "The evidence will be that while in either the county jail or the penal system, [Petitioner] has not presented himself as a threat or as a danger to anyone, that during his incarceration that he has made a change, that he has done positive things during that time" (II Trial Tr. IX, 1691-92).

The defense presented five witnesses in the second stage. Their testimony is summarized as follows:

(1)    Charles Harris, a supervisor for Oklahoma Correctional Industries, testified that Petitioner worked for him while he was incarcerated for the Marshall/Hoster rapes. Mr. Harris testified that Petitioner was not violent, and he described Petitioner as a good worker, dependable and fun to work with (II Trial Tr. X, 1720, 1722, 1723).

(2)    Jason Ledford, a detention officer at the Oklahoma County Jail, testified as to Petitioner's behavior while he was incarcerated there. Mr. Ledford, who had known Petitioner for two to three years, testified that Petitioner was housed in an honor pod, that he was not a bad person, that he had never had any problems with him, and that he had never seen Petitioner be violent (II Trial Tr. X, 1740-44).

(3)    Terry Williams, another detention officer at the Oklahoma County Jail, testified that Petitioner was one of his top orderlies. Mr. Williams testified that Petitioner was responsible, did a good job, and could be relied upon to complete given tasks. Mr. Williams testified that Petitioner became an orderly by staying out of trouble and being a responsible, respectful inmate. Mr. Williams testified that Petitioner kept himself and his room clean and neat, that he did not bother anybody, and never got into any trouble with other inmates or officers (II Trial Tr. X, 1756-62).

(4)  Harriet Tingle, Petitioner's niece, testified that given the closeness of their ages, Petitioner was more like a brother to her. Ms. Tingle testified that Petitioner was one of ten children, and she identified other family members who were present at the trial, including Petitioner's mother, two sisters, a brother, and a nephew. Ms. Tingle testified that Petitioner had family that loved and supported him, and that the family had kept in contact with Petitioner during his incarceration. Ms. Tingle testified that the family would continue to love and support Petitioner, regardless of the outcome, and that if Petitioner were to receive a sentence other than death, she would continue to have contact with him (II Trial Tr. X, 1763, 1765-70).

(5)  Jim Fowler, Mrs. Fowler's oldest son, testified about his mother and how he was the last family member to see her alive. Mr. Fowler testified that he contacted Petitioner's counsel about testifying. Mr. Fowler testified that he did not favor the death penalty in this case, and he recommended that the jury sentence Petitioner to life without parole (II Trial Tr. X, 1774-78, 1781-82).

In second stage closing argument, trial counsel argued that Petitioner "acts nothing like the man who would do this. Nothing. But yet we know it's the same guy. It's 15 years later and that's the difference" (II Trial Tr. X, 1811). Counsel argued that unlike a normal case, where the trial comes right after the crime and you do not know if a defendant could survive in prison without killing someone, Petitioner's case is different. "We know for a fact that he can survive in prison and not hurt anybody because he's done it for 15 years" (II Trial Tr. X, 1813-14). "And just like I told you the first time, you could look at the pictures and just quit because it's so bad, or you can go deeper. And I submit to you that in this case you should go deeper" (II Trial Tr. X, 1814).

Trial counsel argued for a sentence of life without parole, "not because he deserves it, but out of mercy" (II Trial Tr. X, 1816). Counsel urged the jury to look at Petitioner's

track record while incarcerated – "he can be productive" (II Trial Tr. X, 1820). "You've

seen the bad, you've seen his prison behavior, you've seen the positive changes he has made.

We'd ask you to return a sentence of life without parole" (II Trial Tr. X, 1824).

**4.      The Investigation Conducted: What Counsel Knew.**

On direct appeal, and in support of his Rule 3.11 motion, Petitioner's direct appeal

counsel presented an affidavit in which she detailed the results of the mitigation investigation

conducted prior to trial. A copy of the affidavit is included in Petitioner's Appendix.[39]

According to appellate counsel, the investigation provided trial counsel with the following

information:

> 1) [Petitioner] is the youngest of ten children; 2) He was born into extreme
> poverty in rural Texas, with all ten children and two parents sharing a four-
> room shack with no running water or heat; 3) when [Petitioner's] mother was
> pregnant with him, her blood became extremely toxic; 4) [Petitioner] spent the
> first three weeks of his life in the hospital, and his mother was paralyzed the
> first year of his life, which interfered with the bonding relationship;
> 5) [Petitioner] and his family rarely had enough to eat growing up;
> 6) [Petitioner's] father was an abusive, mean, emotionally unavailable man,
> who disciplined his children with large switches constantly over the slightest
> perceived infraction or no infraction at all; 7) As [Petitioner] grew older, his
> older siblings left the home as soon as possible, usually around age fifteen, in
> order to get away from their father; 8) When [Petitioner] was approximately
> ten years old, his mother left his father and took [Petitioner] and his next oldest
> sibling, Mageline, and moved to Lawton; 9) [Petitioner] lived in Lawton for
> approximately one year in very cramped quarters with his mother, Mageline,
> another sister, her husband, and children; 10) After a year in Lawton,
> [Petitioner] moved with is mother to Oklahoma City; 11) [Petitioner's] mother

---

[39] Pursuant to Rule 7 of the Rules Governing Section 2254 Cases in the United States District
Courts, the Court expands the record to include Petitioner's Appendices 3 through 11, as relied upon
by Petitioner in support of his claim. See Hooks v. Workman, 606 F.3d 715, 731 n.14 (10th Cir.
2010) (discussing the purpose and application of Rule 7).

worked two jobs in Oklahoma City and [Petitioner] was virtually parentless at age eleven; 12) [Petitioner] started experimenting with drugs and alcohol at age eleven; 13) By age twelve, [Petitioner's] mother had kicked him out of her home, and [Petitioner] lived on the streets; 14) In the eighth grade, occasionally, [Petitioner] would stay with a friend, Rick Berry, and his family, and Mr. Berry recalls [Petitioner] being filthy and hungry, and having to sneak into his mother's home to steal food; 15) Mr. Berry also recalls that [Petitioner's] family did not love him or want anything to do with him, that they ignored him and refused to take him in when he had nowhere to go at age twelve; 16) By age fourteen, [Petitioner] had fallen in with a delinquent crowd and was arrested by authorities for unauthorized use of a motor vehicle and placed on juvenile probation; 17) At age sixteen, [Petitioner's] mother informed juvenile authorities that [Petitioner] had violated probation for "lack of parental control" and [Petitioner] was placed in the Oklahoma Children's Center (OCC) juvenile home in Taft, Oklahoma; 18) [Petitioner] was held in OCC beyond the completion of his sentence because the Department of Human Services had no place to which to release him; 19) [Petitioner] was finally released from OCC in 1978; six months before he turned eighteen; 20) In 1979, an investigation into Oklahoma's juvenile facilities, including OCC, was conducted for the *Terry D. v. Department of Human Services* case, and widespread abuses were found to have occurred in those homes during the time [Petitioner] was incarcerated at OCC, including hog-tying children, leaving them in solitary confinement for extended periods of time, keeping them after completion of their sentences without due process, not providing education, and more; 21) Upon release from OCC, [Petitioner] began doing landscaping work while living in Oklahoma City; 22) In 1985, [Petitioner] was in a car accident and received a mild to moderate head injury to the frontal lobe and an abrasion to his forehead; he was knocked unconscious for at least thirty minutes; 23) While in prison in 1988, [Petitioner] experienced headaches of such severity that he was transported to the hospital for evaluation and treatment; 24) Intelligence testing, [conducted by Dr. Nelda Ferguson] revealed inconsistencies in cognitive functioning suggestive of brain damage; 25) Neuropsychology testing and evaluation [conducted by Dr. Michael Basso] revealed the same inconsistencies, indicating cognitive dysfunction, with causation unknown [could have been caused by environmental factors], and an overall IQ of 74, with accuracy of 95% at +/-5 points, and borderline mental retardation classification[; and] 26) Dr. Jeanne Russell [a licensed

psychologist] conducted a risk assessment and concluded that [Petitioner] would not pose a risk of future violence in prison.

Appendix 4.

Also contained within the Appendix is a copy of Dr. Russell's Risk Assessment. The

Risk Assessment is dated October 16, 2001, and was compiled from the following:

> Interviews with the defendant (10/8/01 and 10/15/01)
> Jail Staff - Officer Messner (10/15/01)
> OIDS investigator Steve Leedy
> Hare Psychopathy Checklist-Revised (PCL-R)
> HCR-20
> Review of the following records:
>> Transcripts of preliminary hearings for previous convictions dated 8/28/87 on Case # CRF-87-2865 and CRF-87-2867
>> Department of Institutions, Social and Rehabilitative Services (DISRS) records beginning 10/20/76 through 12/28/77
>> Oklahoma Department of Corrections Records dated 9/14/87 through discharge - which occurred on 2/13/98
>> Wechsler Adult Intelligence Scale III (WAIS-III) dated 2/10/00
>> MCMI-III dated 2/10/00
>> MMPI-2 dated 2/14/00

Appendix 11, p. 1. In the Risk Assessment, Dr. Russell details Petitioner's relevant

background information, including his prior incarceration, family history, education,

substance abuse history, psychiatric history (none), medical history (none), relationships,

employment, and criminal history. From her observations and testing, Dr. Russell concluded

that Petitioner's thought processes are logical and coherent; he does not suffer from a major

mental disorder; he is not a psychopath; he is intellectually low-functioning; he exhibits

erratic mood fluctuations; and he has an increased risk of future aggression in both the

community setting and the prison setting, although the risk is reduced in the

latter. Appendix 11. According to Dr. Russell, "[Petitioner's] results suggest he is self-centered or absorbed and may have difficulty in delaying gratification. Many of his legal difficulties are most likely the product of these attributes coupled with a chronic substance abuse problem." Id. at 5. However, it was Dr. Russell's ultimate opinion that while Petitioner's risk to others in the community would be high, his risk to others in a prison setting should be considered low, given his incarceration history and the limited access to alcohol, drugs, weapons, and potential victims. Id. at 6.

### 5. The Social History Report.

Petitioner's initial complaint with his trial counsel's actions is in not going further and obtaining a social history report. Petitioner asserts that a social history report could have "explain[ed] his psychological and social development, humanize[d] him to the jury, and put the crimes in a context that could help the jury understand how [he] could have come to the point where he could commit them." Petition, p. 136. On appeal, Petitioner's appellate counsel actually obtained a Social History report, a copy of which is contained in his Appendix. The report was prepared by Dr. Russell, the same expert who prepared the Risk Assessment. For the most part, Dr. Russell used the same information she used for the Risk Assessment. Additional information included two more interviews with Petitioner and interviews with Petitioner's family and friends. Appendix 5, p. 1. In her report, Dr. Russell explains that a social history report "looks at historical factors to better understand behavior." Id.

Presumably because Dr. Russell conducted additional interviews with Petitioner and first-time interviews with his family and friends, the Family History section of the Social History report is more detailed; however, it contains little additional information that trial counsel did not already know. The new information includes: (1) a description by one of Petitioner's brothers regarding the prejudice the family experienced due to their race and poverty; (2) that Petitioner's view of his childhood, particularly the treatment by his father, differs from other family members in that he "glamorizes" his early childhood and "appears to repress and deny any faults or mistakes on the part of his parents"; and (3) Petitioner and his siblings all have positive views of their mother. Appendix 5, pp. 2-5. Presumably new information is also found in the Sexual History section. There, Dr. Russell reports that Petitioner denies ever being sexually abused and having any interest in older women as sexual partners. Id. at 5-6.

The Relationships Section of the Social History report is also more detailed, particularly as to Petitioner's relationship with Donna Burton. While Ms. Burton acknowledges the relationship, which occurred when Petitioner was in his early-to-mid-twenties, she describes it in a casual manner. Although Petitioner and Ms. Burton were involved, Ms. Burton continually saw other men throughout their relationship. Petitioner was neither angry nor hurt by her lack of exclusivity. Ms. Burton had a daughter, which Petitioner believes to be his, although paternity was never established. Although Ms. Burton broke up with Petitioner in 1984 or 1985, Petitioner cared and provided for the child until his

arrest in 1987. Ms. Burton was shocked by Petitioner's arrest, and stated that "the only reason she could think of for [Petitioner's] behavior was that he was so hurt about their break-up." Appendix 5, pp. 6-7.

The Social History report provides a psychological history. It is Dr. Russell's opinion that in order to deal with psychological pain, Petitioner projects blame on others, and employs mechanisms of denial and repression. Dr. Russell's primary support for this conclusion is Petitioner's DISRS records and the psychological testing conducted by Dr. Ferguson, information which trial counsel already had. Appendix 5, pp. 7-8.

Ultimately, Dr. Russell concludes that Petitioner's history provides "a background for understanding why [he] eventually aggressed against older women in such a violent and abusive way." Appendix 5, p. 10. First, his relationship with his mother and then Ms. Burton:

> Although [Petitioner] has a very positive relationship with his mother, her decision to move to the city was in his mind the single most devastating event in his life. He repressed his anger toward her, a defense he continued to use throughout his life. Intellectually, he understands her desire for an easier life but emotionally her decision resulted in his loss of all that was important to him. When he began acting out, she emotionally and physically abandoned him admitting to lacking the energy to counsel and control him. . . . Instead of expressing his anger, he denied it existed. In fact, [Petitioner] rarely expressed or acknowledged anger toward women who were significant in his life for fear of being abandoned. His relationship with Donna Burton provides additional insight into how he dealt with fear of abandonment. [Petitioner] believes she is the mother of his child and attempted to form a relationship with Donna and her daughter Candy. After Donna[] explained she needed more in a relationship, [Petitioner] continued to see and care for Candy and in his mind maintained a relationship intermittently with Donna. It is significant to note that the crimes against women began after Donna's break-up with [Petitioner].

Although Donna expressed surprise over [Petitioner's] crimes against women, she speculated that perhaps this break-up sent him over the edge. Although this break-up may have been the catalyst for his aggression, it is more likely that a pattern of failed relationships beginning with his mother set the stage.

Id. Second, substance abuse:

According to [Petitioner], he changed when under the influence of alcohol describing himself as a different person. When drinking, this built up or repressed anger was released and he aggressed violently against women with whom he had no relationship and who could not retaliate. It was simply not safe to react toward people he cared about as he remained dependent or at least hopeful of saving these relationships. Instead he selected women who were unable to defend themselves, either physically or emotionally. These acts provided temporary relief from the rage and helplessness he felt in his own life.

Id.

6.    **Analysis.**

As Strickland and Wiggins emphasize, the question that must be answered in the first instance is whether the mitigation investigation conducted by trial counsel was itself reasonable. It was. The record is abundantly clear that Petitioner's counsel conducted a substantial mitigation investigation. Trial counsel knew Petitioner's life history. They were aware of his low cognitive function and his issues with alcohol. They had him evaluated by no less than three mental health experts. Through these evaluations, they determined that Petitioner did not have a major mental illness; that he was not a psychopath; that his low cognitive function could not be attributed to brain damage; and that he had the potential for future aggression. Unlike Wiggins, this is not a case where "counsel abandoned their

investigation of [P]etitioner's background after having acquired only a rudimentary knowledge of his history from a narrow set of sources." Wiggins, 539 U.S. at 524.

Despite their substantial investigation, Petitioner asserts that trial counsel should have done more. Petitioner claims that the investigation was incomplete because trial counsel failed to obtain a social history report. Petitioner asserts that trial counsel's failure to obtain a social history report "fell below professional norms for capital representation in Oklahoma in 2001." Petition, p. 145.

In Wiggins, the petitioner supported his ineffective assistance of counsel claim with a social history report. The report detailed the petitioner's life history based on social services, medical, and school records, as well as interviews with the petitioner and members of his family. Id. at 516. The Supreme Court noted that the obtaining of a social history report was standard practice in Maryland at the time of the petitioner's trial. Id. at 524. However, in Wiggins, the Supreme Court did not find that the failure to obtain a social history report was per se ineffective. Without question, the representation of a capital defendant includes "an obligation to conduct a thorough investigation of the defendant's background." Williams v. Taylor, 529 U.S. 362, 396 (2000). The method by which this information is obtained is not mandated. As acknowledged in Strickland,

> No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant. Any such set of rules would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions. Indeed, the existence of detailed guidelines for

representation could distract from the overriding mission of vigorous advocacy of the defendant's cause. Moreover, the purpose of the effective assistance guarantee of the Sixth Amendment is not to improve the quality of representation, although that is a goal of considerable importance to the legal system. The purpose is simply to ensure that criminal defendants receive a fair trial.

Strickland, 466 U.S. at 688-89 (citation omitted).

Here, trial counsel had significant information regarding Petitioner's life history. This information permitted trial counsel to make a sound, strategic decision of whether or not to present it. While the Social History report may have provided trial counsel with some new information, the additional information contained therein is simply not enough to conclude that a reasonable attorney would have, upon consideration of the same, altered the trial strategy. Cf. Wiggins, 539 U.S. at 534-35 (finding that a competent attorney, with knowledge of the "powerful" mitigating evidence that trial counsel failed to discover, would have presented it at sentencing). Wiggins reinforces the principle "that Strickland does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing. Nor does Strickland require defense counsel to present mitigating evidence at sentencing in every case." Wiggins, 539 U.S. at 533. The reasons why counsel choose not to present this information is not borne out by the record, but the extent of their investigation is. Strategic choices are "virtually unchallengeable" when preceded by proper investigation. Strickland, 466 U.S. at 690. Such is the case here.

In the present case, counsel, fully aware of the difficulties encountered by Petitioner in his life, opted to pursue a different mitigation strategy. Rather than look to the past, including the horrific crimes that were committed, trial counsel opted to look forward. This case is unique in that the trial occurred some fifteen years after the crime, and Petitioner had been incarcerated continually since shortly after their commission. Petitioner, therefore, had an extensive history of life in incarceration. Trial counsel requested that the jury return a sentence of life without parole and supported this recommendation with evidence that Petitioner was a good prisoner. Counsel argued that in a prison setting, Petitioner could be productive and nonviolent. This argument was not only relevant to the continuing threat aggravator, which the jury rejected, but to the jury's overall determination of an appropriate sentence. See Skipper v. South Carolina, 476 U.S. 1, 7 n.2 (1986) ("Such evidence of adjustability to life in prison goes to a feature of the defendant's character that is highly relevant to a jury's sentencing determination."). And, in addition to this evidence, trial counsel presented evidence that Petitioner had a family who loved and supported him, and a sentence recommendation of life without parole from one of the victim's own family members. This was sound trial strategy.

For these reasons, Petitioner has failed to demonstrate that his trial counsel rendered deficient performance. The mitigation investigation conducted was reasonable, as was the decision not to present any of Petitioner's background in the second stage.

Although Petitioner's claim of ineffectiveness fails on Strickland's first prong alone, the Court finds that Petitioner has also failed to establish prejudice. Even if trial counsel had presented evidence of Petitioner's life history, with or without the Social History report, there is no reasonable probability that the jury would have "concluded that the balance of aggravating and mitigating circumstances did not warrant death." Strickland, 466 U.S. at 695. As the Supreme Court recently noted, "[t]he likelihood of a different result must be substantial, not just conceivable." Richter, 131 S.Ct. at 792.

Petitioner's life history is a "mixed bag" of helpful and not so helpful. The jury would have been advised that Petitioner grew up in poverty, had an abusive father who was out of his life at age ten, was a juvenile delinquent, had an alcohol problem, and was intellectually low-functioning. Along with this evidence, the jury would have also been advised that he has an increased risk of future aggression, is self-centered, lacks internal controls, exhibits erratic mood fluctuations, and has difficultly delaying gratification. The evidence would have shown that Petitioner has no major mental illness, is not a psychopath, and that he offers little insight into his crimes. Petitioner has never been sexually abused and denies sexual interest in older women. When questioned about his crimes, Petitioner response is "I don't know" or "I don't remember." Appendix 11, p. 4. There is no indication that Petitioner feels any remorse for his actions. According to Dr. Russell, the best explanation for his crimes was a pattern of failed relationships (with his mother and Ms. Burton) and substance abuse. Appendix 11, p. 10. However, as to Petitioner's mother, neither Petitioner nor his siblings

view their mother in a bad light. In fact, per Dr. Russell, they all describe her in angelic terms. Appendix 5, p. 9. In addition, while Dr. Russell states that Petitioner's crimes against women began after Ms. Burton's break-up with Petitioner, Dr. Russell reports that Ms. Burton broke up with Petitioner in 1984 or 1985, but Petitioner's first crime against women was the rape and murder of Mrs. Fowler in September of 1986. Id. at 7.

Balanced against this "mitigating" evidence would be the evidence supporting the aggravating circumstances, primarily the very circumstances of the crimes. Petitioner attacked two elderly, defenseless women in their homes. He broke into their homes at night and raped them in their own beds. He then suffocated them both with a pillow. The evidence supporting the especially heinous, atrocious, or cruel aggravator was overwhelming, and the additional aggravator, murder to avoid arrest, was also supported by the evidence. Therefore, even if trial counsel had presented evidence of Petitioner's life history, Petitioner has not shown a reasonable probability that the jury would have returned a sentence other than death. For this reason as well, Petitioner's claim that his trial counsel rendered ineffective assistance with respect to the investigation and presentation of mitigation evidence fails.

### 7.      The Issue of Petitioner's Consent.

Petitioner additionally alleges that his trial counsel rendered deficient performance by failing to obtain his consent to the mitigation strategy pursued. Through an affidavit, Petitioner avers that he cooperated with trial counsel in the mitigation investigation and that

"[his] attorneys never discussed with [him] their decision not to present evidence about his background in second stage."  Appendix 3, p. 2.

Although Petitioner has a constitutional right to present mitigating evidence, Lockett v. Ohio, 438 U.S. 586, 604 (1978), Petitioner has cited no authority requiring trial counsel to obtain his consent to the mitigation strategy employed.  While trial counsel has a duty consult with his client regarding important decisions, Strickland, 466 U.S. at 688, the Supreme Court has acknowledged that "[t]he adversary process could not function effectively if every tactical decision required client approval."  Taylor v. Illinois, 484 U.S. 400, 418 (1988).  Nevertheless, the Supreme Court has recognized that certain decisions require a defendant's express consent.  These include "'whether to plead guilty, waive a jury, testify in his or her own behalf, or take an appeal.'"  Nixon, 543 U. S. at 187 (quoting Jones v. Barnes, 463 U.S. 745, 751 (1983)).  In Nixon, the Court even declined to add to this list trial counsel's concession of a defendant's guilt.  Id. at 189, 192.  Thus, in the absence of Supreme Court authority, any failure by trial counsel to obtain Petitioner's consent was not ineffective.

### 8.  Conclusion.

For the reasons set forth above, the Court concludes that Petitioner's trial counsel were not ineffective with respect to the investigation and presentation of mitigating evidence. Having expanded the record and given full consideration to the documents presented to the Court in support of Petitioner's claim, and for the reasons more fully detailed in

Article IV.U., infra, the Court finds that Petitioner's claim is properly denied upon the record before the Court and without the necessity of an evidentiary hearing.

**P.      Ground Sixteen:     Ineffective Assistance of Appellate Counsel.**

In his Ground Sixteen, Petitioner claims that his appellate counsel was also ineffective. Petitioner faults his appellate counsel for not raising four additional claims on direct appeal. Petitioner presented this claim to the OCCA on post-conviction. The OCCA reviewed the merits of the claim and denied relief. Lott, No. PCD-2002-961, slip op. at 5-10. Respondent contends that Petitioner should be denied relief on this claim because he has not shown that the decision of the OCCA is contrary to or an unreasonable application of Strickland.

"Surmounting Strickland's high bar is never an easy task." Padilla v. Kentucky, ___ U.S. ___, 130 S.Ct. 1473, 1485 (2010). Doing so in light of the deference afforded state court decisions is even more difficult.

> Establishing that a state court's application of Strickland was unreasonable under § 2254(d) is all the more difficult. The standards created by Strickland and § 2254(d) are both "highly deferential,"and when the two apply in tandem, review is "doubly" so[.] . . . The Strickland standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under Strickland with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard.

Richter, 131 S.Ct. at 788 (citations omitted). Within this framework, the Court addresses Petitioner's claim.

In accordance with <u>Strickland</u>, a petitioner alleging appellate counsel ineffectiveness must show (1) that his appellate counsel's actions on appeal were objectively unreasonable and (2) that, but for counsel's unreasonable actions, he would have prevailed on appeal. <u>Smith v. Robbins</u>, 528 U.S. 259, 285-86 (2000); <u>Miller v. Mullin</u>, 354 F.3d 1288, 1297 (10th Cir. 2004). When counsel has filed a brief on the merits, it is difficult to show his incompetence for failing to raise a particular claim. <u>Robbins</u>, 528 U.S. at 288. Appellate counsel does not have an obligation to raise every possible claim irrespective of its merit. In fact, "the hallmark of effective appellate advocacy" is the "process of 'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail." <u>Smith v. Murray</u>, 477 U.S. 527, 536 (1986) (quoting <u>Barnes</u>, 463 U.S. at 751-52). "This has assumed a greater importance in an era when oral argument is strictly limited in most courts—often to as little as 15 minutes—and when page limits on briefs are widely imposed." <u>Barnes</u>, 463 U.S. at 752-53.

In order to evaluate appellate counsel's actions, the omitted issues must be examined. With respect to the omitted issue, the Tenth Circuit has provided the following guidance:

> If the omitted issue is so plainly meritorious that it would have been unreasonable to winnow it out even from an otherwise strong appeal, its omission may directly establish deficient performance; if the omitted issue has merit but is not so compelling, the case for deficient performance is more complicated, requiring an assessment of the issue relative to the rest of the appeal, and deferential consideration must be given to any professional judgment involved in its omission; of course, if the issue is meritless, its omission will not constitute deficient performance.

<u>Cargle</u>, 317 F.3d at 1202 (footnote omitted) (citations omitted).

## 1.    OCCA's Ruling.

In addition to addressing each of the omitted claims, as discussed in more detail below, the OCCA gave an overall assessment of appellate counsel's performance on appeal. The OCCA found that "[a]ppellate counsel filed a well-written, thoroughly researched brief raising numerous claims at least equally meritorious to that which were omitted. . . ." Lott, No. PCD-2002-961, slip op. at 7.  The OCCA also noted that "[a]ppellate counsel would have been hard pressed to raise the allegations now raised on post-conviction in addition to those raised on direct appeal and still comply with [its] page restrictions on appellate briefs." Id. at 10.  The Court agrees.

 Petitioner's brief on appeal was 100 pages, the maximum allowed per OCCA's court rules.  See Rule 9.3(A), Rules of the Oklahoma Court of Criminal Appeals, Title 22, Ch.18, App. (2011).  Within those 100 pages, appellate counsel raised seventeen issues, including speedy trial, prosecutorial misconduct, ineffective assistance of counsel, and multiple evidentiary matters.  Due to page limitations, appellate counsel was forced to raise five issues in a very cursory manner in the final proposition.  Nevertheless, Petitioner contends that appellate counsel should have raised another four issues, issues which took post-conviction (and habeas) counsel over thirty pages to fully brief.  Under these circumstances, the OCCA concluded:

> The issues raised on post-conviction were not plainly meritorious as Petitioner
> claims; therefore it was not unreasonable for appellate counsel to have
> excluded them from the appellate brief.  Appellate counsel appropriately sorted
> through potential claims of error and raised only those with the best chances

114

for relief. That appellate counsel did not prevail on gaining relief for Petitioner is not a sign of ineffectiveness.

Lott, No. PCD-2002-961, slip op. at 10. This is not an unreasonable determination.

### 2. Omitted Issues.

### a. Prosecutorial Misconduct.

On direct appeal, appellate counsel raised two claims of prosecutorial misconduct. Lott, 98 P.3d at 345-46, 349-51. Nevertheless, Petitioner asserts that appellate counsel should have raised additional claims regarding the prosecutor's questions and comments about his guilt, racist remarks, and interjection of facts not in evidence. Petitioner complains that his trial counsel was ineffective as well for not objecting to these instances of prosecutorial misconduct. The OCCA, after reviewing and analyzing the record, found that Petitioner was not prejudiced by appellate counsel's failure to raise this claim. Lott, No. PCD-2002-961, slip op. at 8.

To succeed on a claim of prosecutorial misconduct, a defendant must show that the prosecutor's actions or remarks "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Donnelly, 416 U.S. at 643. While Petitioner asserts that the prosecutor's actions were pervasive, the record reflects that the complained-of conduct occurred during the examination of a single witness, Dr. Wraxall, and in first stage closing argument. Having reviewed the questions and comments individually and cumulatively, the Court cannot find that the OCCA unreasonably determined that appellate counsel was ineffective for failing to raise this claim. See Richter, 131 S.Ct. at 785 ("A state court must

115

be granted a deference and latitude that are not in operation when the case involves review under the _Strickland_ standard itself."). All of the questions and comments were relevant to Petitioner's guilt, and therefore, even if some of them are deemed improper, they could not have denied Petitioner a fundamentally fair trial in light of the overwhelming evidence of his guilt. For this same reason, the lack of objection by trial counsel is of no consequence.

### b.      Failure To Impeach Dr. Wraxall.

Petitioner asserts that appellate counsel should have raised a claim of trial counsel ineffectiveness due to their failure to impeach Dr. Wraxall. In addition to attacking the validity of the testing he conducted, particularly his reliance on evidence provided by Ms. Gilchrist and Meghan Clement, Petitioner also claims that trial counsel should have impeached Dr. Wraxall with evidence regarding his education, credentials, competence, and integrity. With respect to this claim, the OCCA held as follows:

> Due to more precise DNA testing, [Wraxall's] testimony became secondary and cumulative, and trial counsel was limited in trial options available. Trial counsel made reasonable professional choices and Petitioner has failed to show either prejudice or deficient performance.

_Lott_, No. PCD-2002-961, slip op. at 8.

"As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded agreement." _Richter_, 131 S.Ct. at 786-87. Petitioner has not made this showing. As the OCCA found, Dr. Wraxall was not the only DNA expert presented. The more

comprehensive and more damaging DNA testimony came from Ms. Clement. Dr. Wraxall's testimony equated to a second opinion. In addition, based upon evidence provided by Petitioner, it is clear that trial counsel were aware of the impeachment evidence, but made a reasonable strategic decision not to present it. Appendix 9.[40] Petitioner's attack on this decision by his trial counsel is clouded by "the distorting effects of hindsight[.]" Strickland, 466 U.S. at 689. This "is precisely what Strickland and AEDPA seek to prevent." Richter, 131 S.Ct. at 789.

### c.     Failure To Object To Other Crimes Evidence.

Petitioner asserts that appellate counsel should have also raised a claim regarding the failure of trial counsel to object to the admission of other crimes evidence. In addition to the Marshall/Hoster evidence, Petitioner asserts that trial counsel should have also objected to the prosecutor's references to the death sentence Mr. Miller received. In denying Petitioner relief on this claim, the OCCA referenced its decision on direct appeal wherein it determined that the Marshall/Hoster evidence was properly admitted. It then held that "failure of appellate counsel to raise the issue on direct appeal was not ineffective, as [it] would have denied the claim." Lott, No. PCD-2002-961, slip op. at 8.

As to the Marshall/Hoster evidence, the OCCA's determination is reasonable. On direct appeal, the OCCA addressed the propriety of the admission of the evidence. It found that the evidence was properly admitted and that its probative value outweighed its

---

[40] The Court expands the record to include this evidence. See fn. 39, supra.

prejudicial impact. <u>Lott</u>, 98 P.3d at 334-36. <u>See</u> Article IV.C., <u>supra</u>. Given the lack of merit to the underlying claim, neither trial counsel nor appellate counsel can be deemed ineffective with respect thereto. <u>See</u> <u>Snow v. Sirmons</u>, 474 F.3d 693, 724-25 (10th Cir. 2007) (trial counsel was not ineffective for failing to object to certain evidence which the OCCA found admissible); <u>Spears</u>, 343 F.3d at 1249 (trial counsel was not ineffective for failing to object to the giving of a flight instruction where the OCCA found that sufficient evidence supported the giving of the instruction).

As to the prosecutor's references to Mr. Miller's death sentence, this matter was not raised on direct appeal and it does appear that the OCCA addressed this facet of Petitioner's claim on post-conviction. Thus, the Court will address this issue de novo. <u>Wilson</u>, 577 F.3d at 1290 ("If there has been no adjudication on the merits, we review the claim de novo.").

Without citation to the record, Petitioner asserts that the prosecutor referred to Mr. Miller's sentence "many times." Petition, p. 192. It is Petitioner's contention that these references defaulted the sentencing determination to the jury in Mr. Miller's trial in violation of <u>Caldwell v. Mississippi</u>, 472 U.S. 320 (1985). In <u>Caldwell</u>, the Supreme Court found that "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's sentence rests elsewhere." <u>Caldwell</u>, 472 U.S. at 328-29. The Court will not search the record to find support for Petitioner's claim. Based on the

argument presented, the Court finds that Petitioner has not presented a meritorious <u>Caldwell</u>

claim, and appellate counsel was not ineffective for not raising it.[41]

### d. Judicial Bias.

Petitioner's final omitted issue is judicial bias.  Petitioner asserts that the trial judge

made statements, which trial counsel failed to object to, that reflect his bias toward him.

Petitioner asserts that appellate counsel should have raised this claim on direct appeal.  The

OCCA addressed the merits of this claim and found that appellate counsel was not ineffective

for failing to raise it.

> [A]s to the issue of judicial bias and appellate counsel's failure to raise
> that claim on direct appeal, there is a general presumption of impartiality on
> the part of judges as to matters before them. <u>Carter v. State</u>, 1994 OK CR 49,
> 879 P.2d 1234, 1242, *cert. denied*, 513 U.S. 1172, 115 S.Ct. 1149,
> 130 L.Ed.2d 1107 (1995).  In making a claim of bias, a defendant must
> demonstrate some prejudice, which denied him due process or fundamental
> fairness. <u>Id.</u> We have thoroughly reviewed the record in this case and find
> Petitioner has failed to demonstrate any prejudice.  The evidence of guilt was
> substantial and the trial court sentenced in accordance with the jury's verdict.
> The record shows a fair and impartial trial judge against the Petitioner.

<u>Lott</u>, No. PCD-2002-961, slip op. at 8-9.

Petitioner has not shown that the OCCA unreasonably denied this claim.  "[W]hen a

defendant seeks to prove a violation of due process based on a judge's comments, the

---

[41] As noted herein, Petitioner's trial included numerous references to Mr. Miller and the
development of the facts leading up to the charging of Petitioner with the Fowler/Cutler murders.
Petitioner was equally responsible for presentation of this evidence, including reference to the
sentence Mr. Miller received.  In opening statement alone, trial counsel made no less than three
comments that Mr. Miller had been on death row (II Trial Tr. III, 470). Petitioner cannot maintain
a <u>Caldwell</u> claim premised on the same comments his own counsel made to the jury.

defendant must meet a high burden: the 'judge's actions or comments [must] reveal such a high degree of favoritism or antagonism as to make fair judgment impossible.'" United States v. Gambino-Zavala, 539 F.3d 1221, 1228 (10th Cir. 2008) (quoting United States v. Nicki, 427 F.3d 1286, 1298 (10th Cir. 2005)). Having conducted its own thorough review of the record, the Court finds that Petitioner's claim of judicial bias lacks merit. Thus, as the OCCA found, appellate counsel was not ineffective for failing to raise it.

### 3. Conclusion.

Giving appropriate deference to the OCCA's decision, and having examined the omitted claims, the claims raised, and the page restrictions under which appellate counsel operated, the Court finds that Petitioner has not shown his entitlement to relief on a claim of appellate counsel ineffectiveness. Petitioner's Ground Sixteen is denied.

### Q. Ground Seventeen:    Especially Heinous, Atrocious, or Cruel Aggravator.

In his Ground Seventeen, Petitioner attacks the especially heinous, atrocious, or cruel aggravator. In addition to challenging its constitutionality, Petitioner claims that the jury instruction defining the aggravator was insufficient because it did not advise the jury of the consciousness requirement. Petitioner challenged this aggravator on direct appeal and in post-conviction. Lott, No. PCD-2002-961, slip op. at 11-13; Lott, 98 P.3d at 357-58. Given the presentation of the claim, Respondent asserts that the claim should be procedurally barred. However, the Court finds that the easier course is denial on the merits. See Snow,

474 F.3d at 717 ("We can avoid deciding procedural bar questions where claims can readily be dismissed on the merits.").

In order to satisfy the Eighth Amendment, an aggravating circumstance must meet two requirements: (1) it may not apply to every defendant convicted of murder; and (2) it may not be unconstitutionally vague. Tuilaepa v. California, 512 U.S. 967, 972 (1994). In 1987, the Tenth Circuit found that Oklahoma's especially heinous, atrocious, or cruel aggravator as then applied violated both of these requirements. Cartwright v. Maynard, 822 F.2d 1477, 1478 (10th Cir. 1987). The Supreme Court agreed. Maynard v. Cartwright, 486 U.S. 356 (1988). Even before the Supreme Court issued its decision, however, Oklahoma narrowed its application. In Stouffer v. State, 742 P.2d 562, 563 (Okla. Crim. App. 1987), Oklahoma "restrict[ed] its application to those murders in which torture or serious physical abuse is present." Consistent with this change, the jury in Petitioner's case was specifically instructed that the aggravator was applicable "where the death of the victim was preceded by torture of the victim or serious physical abuse" (O.R. VII, 1234). See Maynard, 486 U.S. at 365 (acknowledging that limiting the heinous, atrocious, or cruel aggravator to cases involving some kind of torture or serious physical abuse would be constitutionally acceptable).

Since Oklahoma's imposition of a more narrow construction, the Tenth Circuit has repeatedly approved of the same, including the very instruction administered in this case. Wilson, 536 F.3d at 1108; Workman v. Mullin, 342 F.3d 1100, 1115-16 (10th Cir. 2003);

Hooks v. Ward, 184 F.3d 1206, 1239-40 (10th Cir. 1999). See also Miller v. Mullin, 354 F.3d 1288, 1300 (10th Cir. 2004) (acknowledging and listing cases in which the Tenth Circuit has upheld Oklahoma's heinous, atrocious, or cruel aggravator since Maynard); Medlock v. Ward, 200 F.3d 1314, 1321 (10th Cir. 2000) ("We have held that the 'heinous, atrocious, or cruel' aggravating circumstance as narrowed by the Oklahoma courts after Maynard to require torture or serious physical abuse characterized by conscious suffering can provide a principled narrowing of the class of those eligible for death."). Petitioner has not presented any valid argument to overcome this abundant and controlling authority.

Regarding Petitioner's additional complaint that the jury was not instructed regarding conscious physical suffering, the Court acknowledges, as did the Tenth Circuit in Wilson, that "[e]ven if the jury instruction did not sufficiently narrow the jury's decision, the state court can also perform this narrowing function on review." Wilson, 536 F.3d at 1108 (citing Walton v. Arizona, 497 U.S. 639, 654 (1990)).[42] In the present case, the OCCA specifically found sufficient evidence supporting the especially heinous, atrocious, or cruel aggravator, including conscious physical suffering.

_____

[42] In Wilson, the Tenth Circuit did not address the effect, if any, of Ring on the ability of a court to perform the narrowing function. Wilson, 536 F.3d at 1108 ("Whatever the merits of this argument in the future, Ring does not apply retroactively and so is inapplicable to his case."). Petitioner makes mention of Ring in his argument of this claim, which is in fact applicable to his case. Nevertheless, the Court finds that Ring does not restrict a court's ability to perform the narrowing function on review. The issue in Ring was "tightly delineated," and it did not address this issue. Ring, 536 U.S. at 597 n.4. The issue has not subsequently been addressed by the Supreme Court. See Bell v. Cone, 543 U.S. 447, 454 n.6 (2005) ("[T]his case does not present the question whether an appellate court may, consistently with Ring, cure the finding of a vague aggravating circumstance by applying a narrower construction.").

The evidence in the present case shows that in two separate instances, [Petitioner] unexpectedly attacked an elderly woman in her home. The evidence in Mrs. Fowler's case showed some resistance on her part, and her eventual capitulation. The evidence showed that both victims were physically abused during the assault and rapes and as a result suffered injuries that would have been painful. Each victim surely suffered great mental anguish as she were suffocated by [Petitioner] bearing down on a pillow covering her face.

Considering the unprovoked manner of the killings . . .; the conscious suffering of the victims, both physically and emotionally; the attitude of the killer as evidenced by [Petitioner's] attacks upon victims who could not adequately defend themselves, we find, construing the evidence in the light most favorable to the state, the jury's finding of the heinous, atrocious or cruel aggravator was supported by sufficient evidence.

Lott, 98 P.3d at 358. Thus, even if the instruction were deemed incomplete, the OCCA's findings satisfied the narrowing function.

In conclusion, the Court finds that Petitioner's Ground Seventeen fails. Irrespective of the matter of procedural bar, Petitioner's claim is unworthy of relief and is denied on the merits.

### R.    Ground Eighteen:        Admission of the Medical Examiner Slides.

In his Ground Eighteen, Petitioner complains about the admission of slides from the Medical Examiner's Office (State's Exhibits 203 and 204). Petitioner's complaint concerns Dr. Balding's allegedly inconsistent statement about the evidence in 1989 and the surprise discovery of the evidence during Petitioner's first trial in 2001. Petitioner raised this claim on post-conviction and the OCCA denied relief. Lott, No. PCD-2002-961, slip op. at 13-15, 16. Although hinting at the application of a procedural bar, Respondent argues the merits

of the claim and asserts that Petitioner is not entitled to relief because he has not met his burden under Section 2254(d).

The exact nature of Petitioner's claim is indeterminable. Petitioner asserts in the proposition heading that the admission of the slides violated his Sixth, Eighth, and Fourteenth Amendment rights; however, in his discussion of the claim, he details the facts of the claim only. Petitioner does not specify the legal claim raised, nor does he cite any legal authority. Petition, pp. 204-05. Nevertheless, whatever the claim is, it is clear that the very same claim, verbatim, was presented to the OCCA and denied on the merits. See Application for Post-Conviction Relief, Case No. PC-2002-961, pp. 59-60. Thus, Petitioner's ability to obtain habeas relief on this claim is contingent upon him showing that the decision of the OCCA is contrary to or an unreasonable application of Supreme Court law. Again, not only does Petitioner not even make such an assertion, but he cites no Supreme Court case in support of his claim. See Tovar Mendoza v. Hatch, 620 F.3d 1261, 1268 (10th Cir. 2010) ("[A] petitioner seeking federal habeas relief must establish that a state court decision adjudicating a constitutional claim on the merits 'was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States. . . .'"). Accordingly, Petitioner's Ground Eighteen is denied.

### S.    Grounds Nineteen and Twenty: Constitutionality of the Death Penalty and Lethal Injection.

In his Grounds Nineteen and Twenty, Petitioner challenges the constitutionality of the death penalty and lethal injection. Petitioner raised both of these claims in post-conviction. The OCCA found that the issues were waived due to Petitioner's failure to raise them on direct appeal. Lott, No. PCD-2002-961, slip op. at 15, 16. Respondent argues that these claims are procedurally barred but are also without merit. The Court agrees.

In its order denying Petitioner post-conviction relief, the OCCA addressed the "narrow scope of review available under the amended Post-Conviction Procedure Act." Id. at 1.

> Under 22 O.S.2001, § 1089(C)(1), the only claims which will be considered on post-conviction are those which "[w]ere not and could not have been raised" on direct appeal and which "support a conclusion either that the outcome of the trial would have been different but for the errors or that the defendant is factually innocent."

Id. at 2. With respect to Petitioner's Grounds Nineteen and Twenty, the OCCA found that "[b]oth of [the] claims could have been raised on direct appeal, but were not. Therefore, further consideration is waived." Id. at 15. Because the OCCA procedurally barred these claims, the claims are barred here as well, as Petitioner has failed to overcome its imposition. See Article IV.K., supra (rejecting Petitioner's argument against the application of a procedural bar to any of his claims).

In addition, the claims are without merit. Regarding the constitutionality of the death penalty, even Petitioner acknowledges that it has been held constitutional. Petition, p. 205.

See Baze v. Rees, 553 U.S. 35, 47 (2008) ("We begin with the principle, settled by Gregg [v. Georgia, 428 U.S. 153 (1976)], that capital punishment is constitutional."). As to Petitioner's claim concerning lethal injection, Petitioner asserts that current lethal injection protocols (and the procedures for devising said protocols) violate the Eighth and Fourteenth Amendments. However, once again, Petitioner makes absolutely no argument in support of his claim. Petition, p. 206. Even though Petitioner's claim fails on this ground alone, the Court would further note that the Supreme Court "has never invalidated a State's chosen procedure for carrying out a sentence of death as the infliction of cruel and unusual punishment[,]" Baze, 553 U.S. at 48, and recent challenges to Oklahoma's protocol have proven unsuccessful. Pavatt v. Jones, 627 F.3d 1336 (10th Cir. 2010); Hamilton v. Jones, 472 F.3d 814 (10th Cir. 2007); Patton v. Jones, 193 Fed. Appx. 785 (10th Cir. 2006) (unpublished).

For the foregoing reasons, Petitioner's Grounds Nineteen and Twenty are denied.

**T.    Ground Twenty-One:    Cumulative Error.**

In his Ground Twenty-One, Petitioner raises a claim of cumulative error. Petitioner asserts that he is entitled to relief on a cumulative error theory due to the cumulative effect of (1) his claims regarding the ineffectiveness of his counsel; and/or (2) the allegations of error he raised on direct appeal. Petitioner raised a claim of cumulative error on direct appeal and in post-conviction. Lott, No. PCD-2002-961, slip op. at 15-16; Lott, 98 P.3d at 357.

As recognized by the Tenth Circuit, "[t]he cumulative effect of two or more individually harmless errors has the potential to prejudice a defendant to the same extent as

a single reversible error. The purpose of a cumulative-error analysis is to address that possibility." United States v. Rivera, 900 F.2d 1462, 1469 (10th Cir. 1990). "A cumulative-error analysis merely aggregates all the errors that individually have been found to be harmless, and therefore not reversible, and it analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless." Id. at 1470. In capital cases, the focused inquiry is "whether the errors 'so infected the trial with unfairness as to make the resulting conviction a denial of due process, or rendered the sentencing fundamentally unfair in light of the heightened degree of reliability demanded in a capital case.'" Wilson, 536 F.3d at 1122 (quoting Thornburg, 422 F.3d at 1137).

Of all the grounds raised by Petitioner, the OCCA found two errors on direct appeal.[43] Raised as his fifth assignment of error on direct appeal, and presented here as his Ground Five, the first error concerned character and hearsay evidence regarding Mrs. Cutler. While the OCCA found some of the evidence admissible, it also concluded that some of the evidence should not have been admitted. The OCCA declined to grant relief on the erroneously admitted evidence after conducting a harmless error analysis. Lott, 98 P.3d at

---

[43] In his eighth assignment of error on direct appeal, Petitioner complained about the omission of three jury instructions. While the OCCA found that the jury was adequately instructed in the absence of these three specific instructions, the OCCA's opinion can be construed as finding that two of the instructions should have been given. Lott, 98 P.3d at 338-39. Petitioner has raised this claim in his Ground Eight and the Court has denied relief. See Article IV.H., supra. Even if this claim were considered for its cumulative effect, the Court finds that Petitioner would still not be entitled to relief for cumulative error.

127

340-41.   Reviewing these errors under <u>Brecht</u>, this Court also denied relief.   <u>See</u> Article IV.E., <u>supra</u>.  Raised as his tenth assignment of error on direct appeal, and presented here as his Ground Ten, the second error concerned Mrs. Fowler's granddaughter testifying as a victim impact witness.  The OCCA concluded that Mrs. Fowler's granddaughter was not a permissible victim impact witness under state law; however, reviewing the claim under <u>Payne</u>, the OCCA found that her testimony did not "cause[] the verdict to be the result of an unreasonable emotional response."  <u>Lott</u>, 98 P.3d at 348.  This Court reviewed the OCCA's determination and found that it was not contrary to or an unreasonable application of <u>Payne</u>.  <u>See</u> Article IV.J., <u>supra</u>.  No additional errors were found by this Court.

Although the cumulative effect of these errors should have been addressed by the OCCA on direct appeal, the Court finds that its cumulative error review was meaningless and not entitled to deference.  <u>Lott</u>, 98 P.3d at 357.  Therefore, in accordance with <u>Darks v. Mullin</u>, 327 F.3d 1001, 1016-18 (10th Cir. 2003), the Court reviews this claim de novo.

The Court finds that the errors, when viewed cumulatively, did not deprive Petitioner of a fair trial.  Both errors involved improperly admitted evidence. When considered in light of all of the other evidence presented, it cannot be said that this improper evidence affected either the guilt or sentencing phases of Petitioner's trial.  Petitioner's Ground Twenty-One is therefore denied.

U.	**Ground Twenty-Two:	Petitioner's Evidentiary Hearing Request.**

In his Ground Twenty-Two, Petitioner requests an evidentiary hearing. For the following reasons, the request is denied.

Petitioner asks this Court to grant him the evidentiary hearing he was denied in state court. On direct appeal, Petitioner sought an evidentiary hearing in support of the ineffective of assistance of counsel claims presented to this Court in his Grounds Four and Fifteen. <u>See</u> Application for Evidentiary Hearing on Sixth Amendment Claims, Case No. D-2002-88. On post-conviction, Petitioner requested an evidentiary hearing on the ineffectiveness of both his trial and appellate counsel with regard to the impeachment of Mr. Wraxall,[44] presented to this Court in his Ground Sixteen, and the admission of slides from the medical examiner, presented to this Court in his Ground Eighteen. <u>See</u> Petitioner's Application for an Evidentiary Hearing.

In determining a petitioner's entitlement to a hearing, an initial inquiry must be made regarding his efforts to develop the claim in the state court. If a petitioner was diligent in the presentation of his claim in state court proceedings, then he "is entitled to an evidentiary

---

[44] Petitioner requested a hearing on (1) "[w]hether trial counsel were constitutionally ineffective in their failure to impeach State's witness Brian Wraxall; and whether his testimony should have been allowed at a <u>Kuhmo</u> hearing had such evidence been presented[;]" and (2) "[w]hether the involvement of Joyce Gilchrist and/or the lab in which she was employed affected Mr. Lott's sentence and/or conviction, or caused prejudice to Mr. Lott[.]" Application for an Evidentiary Hearing attached to his Application for Post-Conviction Relief, Case No. PC-2002-961, p. 67. Because Petitioner raised no independent claims regarding a <u>Kuhmo</u> hearing or Ms. Gilchrist, the Court construes all these issues as being related to the issue of whether trial counsel and/or appellate counsel were ineffective with respect to the failure of trial counsel to impeach Mr. Wraxall.

hearing in federal court 'so long as his allegations, if true and if not contravened by the existing factual record, would entitle him to habeas relief.'" <u>Gonzales v. Tafoya</u>, 515 F.3d 1097, 1121 (10th Cir. 2008) (citation omitted). While diligence is not automatically satisfied by a petitioner's request for an evidentiary hearing in state court, it is the typical support for a finding of diligence. <u>Fairchild v. Workman</u>, 579 F.3d 1134, 1145 (10th Cir. 2009).

Although the Court finds that Petitioner exercised due diligence, the Court additionally finds that an evidentiary hearing is unnecessary in order to determine Petitioner's claims. "[A] hearing is unnecessary if a claim can be resolved on the existing record." <u>Gonzales</u>, 515 F.3d at 1121. Such is the case here. As necessary to the resolution to Petitioner's claims, the Court has expanded the record to include evidence relied upon by Petitioner in support thereof. <u>See</u> fn. 39 and 40. Having fully considered Petitioner's allegations, the Court has found that Petitioner is not entitled to relief, and therefore an evidentiary hearing is unwarranted. Ground Twenty-Two is denied.

## VI. Conclusion.

After a thorough review of the entire state court record, the pleadings filed herein, and the applicable law, the Court finds that Petitioner is not entitled to his requested relief. Accordingly, Petitioner's Petition, Doc. 16, is hereby **DENIED**. A judgment will enter accordingly.

IT IS SO ORDERED this 31st day of March, 2011.

VICKI MILES-LaGRANGE
CHIEF UNITED STATES DISTRICT JUDGE